# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PNC BANK, NATIONAL ASSOCIATION,

    Plaintiff,

  v.

PREDRAG KNEZEVIC, RPM REAL
ESTATE INVESTMENT, INC., NORTH
SAWYER HOLDINGS, LTD., and P AND T
REAL ESTATE INVESTMENT GROUP,
LLC,

    Defendants.

Case No. 20-cv-6099

### SECOND AMENDED COMPLAINT

Plaintiff, PNC Bank, National Association (referred to herein, as "Bank" or "PNC"), by its attorneys Carlson Dash, LLC, and as for its Second Amended Complaint against Predrag Knezevic, RPM Real Estate Investment, Inc., North Sawyer Holdings, Ltd., and P and T Real Estate Investment Group, LLC, alleges and shows to the Court as follows:

### NATURE OF THE ACTION

1. This case arises from a fraudulent scheme perpetrated by Defendants, Predrag Knezevic, RPM Real Estate Investments, Inc., North Sawyer Holdings, Ltd., and P and T Real Estate Investment Group, LLC, through a conspiracy of fraudulent acts.

2. PNC was a lender on multiple small business loans to trucking companies in the Chicagoland area, which almost immediately after the loan proceeds were distributed went into default.

3. Additionally, PNC issued multiple business credit cards to small trucking companies in the Chicagoland area.

1

Case: 1:20-cv-06099 Document #: 112 Filed: 04/27/22 Page 2 of 23 PageID #:1156

4.     While PNC was not being paid on the loans and credit cards, the proceeds of PNC's loans and credit cards were either directly or indirectly being distributed to three real estate companies who are defendants in this action and their principal and owner Predrag Knezevic.

## PARTIES

5.     PNC is a national banking association with its principal place of business located in Pennsylvania, and the state designated on its origination certificate is Delaware.

6.     Predrag Knezevic ("Knezevic") is a citizen of Illinois and resident of the State of Illinois, residing at 6508 N. Richmond St, Unit 2A, Chicago, Illinois.

7.     RPM Real Estate Investment, Inc. ("RPM") is an Illinois corporation with its principal place of business in Chicago, Illinois.

8.     On information and belief, RPM is in the business of owning and operating real estate.

9.     North Sawyer Holdings, Ltd. ("North Sawyer"), is an Illinois corporation with its principal place of business in Chicago, Illinois.

10.    On information and belief, North Sawyer is in the business of owning and operating real estate.

11.    P and T Real Estate Investment Group, LLC ("P&T") is an Illinois limited liability company whose principal place of business was in Chicago, Illinois. Upon information and belief according to the Illinois Secretary of State website, P&T is involuntarily dissolved effective November 27, 2019 and its sole member is Knezevic.

12.    On information and belief P&T was/is in the business of owning and operating real estate.

2

13.     Knezevic, a Manager of P&T, is a citizen of Illinois and resident of the State of Illinois, residing at 6508 N. Richmond St, Unit 2A, Chicago, Illinois.

14.     Knezevic, as of the date of the commencement of this lawsuit, is the President of RPM and North Sawyer, and was a Manager of P&T.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332.   The amounts in controversy exceed, exclusive of interest, fees, and costs, the sum specified under 28 U.S.C. § 1332 and, as detailed above, the parties maintain diversity of citizenship.

16.     A substantial portion of the events or omissions giving rise to the claims asserted herein occurred in this District, and this venue is proper pursuant to 28 U.S.C. § 1391.

### NON-PARTY ENTITIES AFFILIATED WITH DEFENDANTS

17.     Hall Transport, Inc. ("Hall") is an Illinois corporation incorporated on August 29, 2012.

18.     Upon information and belief according to the Illinois Secretary of State website Hall was involuntarily dissolved on February 10, 2020 for failure to file the corporate annual report due in August 2019.

19.     Hall was originally incorporated with the name Halilovic Maintenance.

20.     Jelena Dimic ("Dimic"), was President of Hall and upon information and belief, is a citizen of Illinois and resident of the State of Illinois, residing at 6000 N. Sheridan Rd, Apt 402, Chicago, IL 60660.

21.     In 2018, Dimic as president of Hall changed the name from Halilovic Maintenance to Hall Transport, Inc. and appointed herself as the registered agent.

3

22.     On September 28, 2020, the agent and president for Hall was changed with the Illinois Secretary of State to Irena Radmanovic at 6508 N. Richmond St 1A, Chicago, Illinois 60645.

23.     Defendant Predrag Knezevic owned the property commonly at 6508 N. Richmond St. 1A, Chicago, Illinois 60645.

24.     Drazo Transport, Inc. ("Drazo") is an Illinois corporation incorporated on September 20, 2016.

25.     Upon information and belief according to the Illinois Secretary of State website, Drazo was involuntarily dissolved on February 14, 2020 for failure to file the corporate annual report due in September 2019.

26.     Denali, Inc. ("Denali") is an Illinois corporation incorporated on September 17, 2013.

27.     Upon information and belief according to the Illinois Secretary of State website Denali was involuntarily dissolved on February 14, 2020 for failure to file the corporate annual report due in September 2019.

28.     BlueStar Freight Inc. ("BlueStar") is an Illinois corporation incorporated on January 12, 2004 under the name Torcida Haul Co.

29.     In 2014, Torcida Haul changed its name to BlueStar.

30.     On December 14, 2017, the agent for BlueStar was changed to Mladen Pejanovic.

31.     BlueStar used the property commonly known as 3001 S. Michigan Ave. #207, Chicago, IL 60616 for the address of its registered agent with the Illinois Secretary of State.

32.     3001 S. Michigan Ave. #207, Chicago, IL 60616 S. Michigan is leased by Predrag Knezevic.

4

33.     Mon-Ex, Inc. ("Mon-Ex") is an Illinois corporation incorporated on May 27, 2005.

34.     The president and secretary of Mon-Ex have been listed by the Illinois Secretary of State as having an address of 6508 N. Richmond Unit 2E, Chicago, Illinois.

35.     NKM Logistics LLC is a New Jersey limited liability company that was registered to do business in Illinois in 2017 by Marko Supica.

36.     IM Truck LLC is a Pennsylvania limited liability company which is registered and licensed to do business in Illinois.

37.     The president and registered agent for IM Truck was listed with the Illinois Secretary of State as being Brad Tokarz.

38.     Brad Tokarz is a longtime friend and business partner of Predrag Knezevic.

## FACTUAL ALLEGATIONS

39.     PNC is a national banking association that provides a wide range of services, including deposit accounts and loans, to individuals, small businesses, corporations, and government entities.

## NKM LOGISTICS, LLC AND MARCO SUPICA

40.     On April 13, 2018, NKM Logistics, by and through its principal Marko Supica, executed that certain application requesting that PNC extend a term loan in the amount of $75,000.00 ("NKM Term Loan") which was approved by PNC.

41.     As part of the NKM Term Loan, Marko Supica unconditionally guaranteed to pay all amounts owing from NKM to PNC ("NKM Term Loan Guaranty").

42.     On April 17, 2018, PNC approved NKM's application and issued the Business Banking Term Loan Agreement. The NKM Term Loan, the NKM Guaranty and NKM's Business

5

Banking Term Loan Agreement shall be collectively referred to as "NKM Loan Documents". A copy of the NKM Loan Documents is attached as **Group Exhibit 1.**

43.     According to the NKM Loan Documents, the reason for the NKM Term Loan was for the purchase of equipment. Ex. 1.

44.     The proceeds from NKM Term Loan were disbursed into an account at PNC in the name of NKM.

45.     On or about April 27, 2018, there was a disbursement from NKM's account at PNC to  Marco Supica in the amount of $33,750.00.

46.     On April 27, 2018, Marko Supica obtained a cashier's check from PNC payable to North Sawyer Holdings, LTD in the amount of $18,000.00 which was later deposited by North Sawyer Holdings, LTD. A copy of the cashier's check is attached as **Exhibit 2**.

47.     On information and belief, in April and May, 2018 there were additional payments from either NKM or Marko Supica to the Defendants.

48.     On March 1, 2019, PNC filed a complaint against NKM and Marko Supica for breach of the NKM Loan Documents in the in the Circuit Court of Cook County, known as *PNC National Bank Association v. NKM Logistics and Marco Supica,* Case No. 19-L-0502123 (the "NKM Lawsuit").

49.     On June 21, 2019, judgment was entered in favor of PNC and against NKM and Marko Supica in the amount of $80,026.00. A copy of the judgment is attached as **Exhibit 3**.

50.     The judgment remains entirely unsatisfied.

## HALL TRANSPORT, INC. AND JELENA DIMIC

51.     On July 25, 2018, Hall executed and delivered to PNC an application requesting that PNC extend a term loan for an amount up to $50,000.00 ("Hall Loan") which was approved and funded by PNC by wire transfer.

52.     As part of the Hall Loan, Dimic unconditionally guaranteed to pay all amounts owing from Hall to PNC (the "Hall Loan Guaranty").

53.     On July 25, 2018, Hall executed and delivered to PNC an application requesting that PNC extend a line of credit of $25,000.00 ("Hall Line of Credit") which was approved and funded by PNC by wire transfer.

54.     As part of the Hall Line of Credit, Dimic unconditionally guaranteed to pay all amounts owing from Hall to PNC ("Hall Line of Credit Guaranty") The Hall Loan, Hall Loan Guaranty, Hall Line of Credit, and Hall Line of Credit Guaranty shall be collectively referred to as "Hall Loan Documents". A copy of the Hall Loan Documents is attached as **Group Exhibit 4**.

55.     According to the Hall Loan Documents, the reason for the Hall Loan was for the purchase of equipment. Ex. 4.

56.     According to the Hall Loan Documents, the reason for the Hall Line of Credit was for working capital. Ex. 4.

57.     Hall was purportedly a trucking company.

58.     On July 28, 2018, three days after receiving the funds from PNC, Hall issued a check drawn from its PNC account to the order of RPM in the amount of $14,000.00 and on August 6, 2018, Hall issued another check drawn from its PNC account to the order of RPM in the amount of $7,000.00 (collectively referred to as the "Hall Checks"). A copy of the Hall Checks is attached as **Group Exhibit 5**.

59.     Since September 2018, two months after the Hall Loan was funded, Hall and Dimic defaulted under the terms of the Hall Loan Documents by failing to make payments as required by the Hall Loan.

60.     In October 2018, three months after the Hall Line of Credit was funded, Hall and Dimic defaulted under the terms of the Hall Loan Documents by failing to make payments as required by the Hall Line of Credit.

61.     On March 20, 2019, PNC filed a four-count complaint against Hall and Dimic for breach of the Hall Loan Documents in the United States District Court for the Northern District of Illinois, Eastern Division, known as *PNC National Bank Association v. Hall Transport, Inc. and Jelena Dimic*, Case No. 19-cv-01930 (the "Hall Lawsuit"). A copy of the Hall Lawsuit is attached as **Exhibit 6**.

62.     On May 28, 2019, a judgment was entered in favor of PNC and against Hall in the amount of $81,843.56 plus fees and costs. A copy of the judgement is attached as **Exhibit 7**.

63.     The judgment remains unsatisfied.

### HALL TRANSPORT AND BLUE STAR FREIGHT

64.     On or about July 30, 2018, Hall Transport opened up a credit card with PNC in the name of Jelena Diminic (the "Hall Credit Card").

65.     On August 9, 2018 Blagoie Slijepcevic opened a PNC Visa Credit Card in the name (the "Blagoie Credit Card").

66.     Between August 7, 2018 and August 11, 2018, the following charges were placed on the Hall Credit Card.

| | | | |
|---|---|---|---|
| a) | 08/07/2018 | $5,824.44 | BlueStar Freight INC in Chicago, IL |
| b) | 08/07/2018 | $5,472.33 | BlueStar Freight INC in Chicago, IL |
| c) | 08/09/2018 | $4,802.11 | BlueStar Freight INC in Chicago, IL |
| d) | 08/10/2018 | $6,205.42 | BlueStar Freight INC in Chicago, IL |

Case: 1:20-cv-06099 Document #: 112 Filed: 04/27/22 Page 9 of 23 PageID #:1197

e) 08/11/2018    $2,621.11    BlueStar Freight INC in Chicago, IL

67.    Between August 21, 2018 and August 27, 2018, the following charges were placed on the Blagoie Credit Card.

a) 08/21/2018    $4,361.22    Blue Star Freight INC in Chicago, IL
b) 08/27/2018    $4,643.12    Blue Star Freight INC in Chicago, IL

68.    Neither the amounts owing on the Hall Credit Card or the Blagoie Credit Card were paid to PNC.

69.    The Defendants received the following checks from Bluestar Freight:

a) July 17, 2018, a check in the amount of $2,450.00 paid to the order of RPM
b) July 25, 2018 check in the amount of $2,000.00 payable to Knezevic
c) July 25, 2018 a check in the amount of $12,000.00 paid to the order of RPM
d) July 27, 2018 check in the amount of $3,7000 payable to Knezevic
e) July 31, 2018 check in the amount of $1,400.00 payable to Knezevic
f) August 7, 2018 a check in the amount of $1,950.00 paid to the order of North Sawyer
g) August 10, 2018, a check in the amount of $4,650.00 paid to the order of RPM
h) August 13, 2018 check in the amount of $820.00 payable to Knezevic
i) August 13, 2018 a check in the amount of $5,030.00 paid to the order of RPM
j) August 15, 2018 a check in the amount of $3,564.00 paid to the order of RPM
k) August 15, 2018 check in the amount of $1,710.00 payable to Knezevic
l) August 16, 2018 check in the amount of $2,130.00 payable to Knezevic
m) August 17, 2018 a check in the amount of $2,500.00 paid to the order of North Sawyer
n) August 23, 2018 a check in the amount of $5,650.00 paid to the order of RPM

### DRAZO TRANSPORT, INC.

70.    On November 9, 2018, Drazo executed and delivered to PNC an application requesting that PNC extend a term loan for an amount up to $60,000.00 ("Drazo Loan") which was approved and funded by PNC by wire transfer ("Drazo Loan Documents"). A copy of the Drazo Loan Documents is attached as **Exhibit 8**.

71.    According to the Drazo Loan Documents, the reason for the Drazo Loan was for the purchase of equipment. Ex. 8.

72.     Drazo was purportedly a trucking company.

73.     Drazo, upon receipt of the funds from the Drazo Loan, issued the following checks drawn from its PNC account:

a) November 26, 2018, a check in the amount of $9,000.00 paid to the order of RPM
b) November 27, 2018, a check in the amount of $9,200.00 paid to the order of North Sawyer,
c) November 27, 2018, a check in the amount of $8,000.00 paid to the order of P&T

74.     The checks drawn on Drazo's PNC account are collectively referred to as the "Drazo Checks". A copy of the Drazo Checks is attached as **Group Exhibit 9**.

75.     Since January 2019, two months after the Drazo Loan was funded, Drazo defaulted under the terms of the Drazo Loan by failing to make payments as required by the Drazo Loan Documents.

## DENALI, INC.

76.     On June 11, 2018, Denali executed and delivered to PNC an application requesting that PNC extend a term loan for an amount up to $75,000.00 ("Denali Loan") which was approved and funded by PNC by wire transfer. A copy of the loan application is referred herein as the "Denali Loan Documents". A copy of the Denali Loan Documents is attached as **Exhibit 10**.

77.     According to the Denali Loan Documents, the purpose of the Denali Loan was for the purchase of a semi-truck. Ex. 7.

78.     On December 18, 2018, Denali issued a check to the order of RPM in the amount of $10,000.00 ("Denali Check"). A copy of the Denali Check is attached as **Exhibit 11**.

79.     On December 29, 2018, weeks after issuing the Denali Check, Denali defaulted under the terms of the Denali Loan by failing to make payments as required by the Denali Loan Documents.

80.     As of September 30, 2020, $67,557.38 of principal is owing on the Denali Loan. Additionally, interest and late fees have and continue to accrue. Those amounts plus, attorneys' fees and costs remain due and owing on the Denali loan.

## MON-EX, INC.

81.     On May 14, 2019, Mon-Ex, Inc. executed and delivered to PNC an application requesting that PNC extend both a term loan for an amount up to $50,000.00 and a line of credit in the amount of $25,000.00 (collectively the "Mon-Ex Loan") which were approved and funded by PNC. A copy of the loan application is referred herein as the "Mon-Ex Loan Documents". A copy of the Mon-Ex Documents is attached as **Exhibit 12**.

82.     According to the Mon-Ex Loan Documents, the alleged purpose of the term loan was for the purchase of equipment.

83.     PNC approved and funded the Mon-Ex loan.

84.     On June 20, 2019, Mon-Ex remitted a certified check to the order of North Sawyer in the amount of $10,000.00 ("Mon-Ex Check"). A copy of the Mon-Ex Check is attached as **Exhibit 13**.

85.     Shortly after the loan was issued Mon-Ex defaulted under the terms of the Mon-Ex Loan by failing to make payments as required by the Mon-Ex Loan Documents.

86.     As of March 28, 2022, $25,000.00 of principal is owing on the Mon-Ex Loan. Additionally, interest and late fees have and continue to accrue. Those amounts plus, attorneys' fees and costs remain due and owing on the Mon-Ex Loan.

### IM TRUCK, LLC

87.     On June 27, 2018, IM Truck executed and delivered to the Bank an application requesting that the Bank extend IM Truck a term loan. A copy of the Credit Application is attached as **Exhibit 14** and incorporated herein by reference.

88.     As part of the Credit Application, IM Truck agreed, that if the Term Credit Application was approved, it would be bound by terms and conditions of the Business Banking Term Loan Agreement. ("IM Term Agreement"). A copy of the IM Term Agreement is attached as **Exhibit 15**.

89.     The Bank approved the term loan and extended credit to IM Truck in the amount of $75,000.00.

90.     IM Truck almost immediately failed to pay the Bank the amounts owing under the IM Term Agreement.

91.     The full principal balance plus interest remains outstanding on the IM Term Agreement.

92.     On information and belief, the Defendant received amounts from IM Truck.

93.     On information and belief, one or more of the Defendants controlled IM Truck.

### I TRUCK LOGISTICS, INC.

94.     On December 20, 2018, I Truck Logistics, Inc. executed and delivered to the Bank an application requesting that the Bank extend I Truck Logistics a term loan. A copy of the Credit Application is attached as **Exhibit 16** and incorporated herein by reference.

95.     The Bank approved the term loan and extended credit to I Truck Logistics in the amount of $75,000.00 (the "I Truck Term Loan").

96.     The owner of I Truck Logistics was Marko Nikolic.

12

97.     I Truck Logistics failed to pay the Bank the amounts owing under the I Truck Term Loan.

98.     The full principal balance plus interest remains outstanding on the I Truck Term Loan.

99.     I Truck Logistics is a Florida corporation.

100.    I Truck Logistics has been dissolved by the state of Florida.

101.    On information and belief Marko Nikolic is currently incarcerated related to the charges against him in Case No. 20-CR-750 currently pending in the United States District Court for the Northern District of Illinois.

102.    The Defendants received the following checks from I Truck Logistics.

   a) March 24, 2018 - $8,000.00
   b) July 14, 2018 - $18,200.00
   c) September 24, 2018 - $8,000.00

103.    I Truck Logistics did not owe a debt to any of the Defendants.

### CITATION ISSUED AS TO RPM

105.    In the Hall Lawsuit, the Clerk of the US District Court issued a Citation to Discover Assets on third-party respondent to RPM ("RPM Citation"). A copy of the RPM Citation and Affidavit of Service are attached as **Exhibit 17**.

106.    On August 21, 2019, in response to the RPM Citation, RPM by its president executed an Affidavit and attached a copy of a check in the amount of $7,000.00 dated August 8, 2018 made payable to RPM by Dimic. A copy of the Affidavit and redacted check are attached as **Exhibit 18**.

107.    In the Affidavit, RPM claims the check was given by Dimic "… as reimbursement for payment of medical expenses on her behalf in Belgrade, Serbia and for no other reason". Ex. 13, par 5.

108.    On September 18, 2019, Knezevic sat for a citation examination on behalf of RPM ("RPM Examination") and testified under oath that he is the sole shareholder of RPM, that RPM is in the business of owning and leasing residential real estate, and that all of the income generated for RPM is from such investments. A copy of excerpts of the RPM Examination are attached as **Exhibit 19**. See p. 7, 11-12.

109.    Mr. Knezevic further testified that he met Dimic through a mutual friend, that he only met her once, and that Dimic needed help getting funds to Serbia. See Ex 14, p. 15-20 and p. 22.

110.    Mr. Knezevic further testified that he only participated in this type of exchange for Dimic once and only for the $7,000.00, that the check was not for services provided by RPM to Hall or Dimic, and that it was not an investment from Hall or Dimic to RPM. See Ex. 14, p.22.

111.    Mr. Knezevic further testified that RPM does not have a relationship with transport companies. See Ex. 14, p. 23-24.

**COUNT I**
**Federal Civil RICO, 18 U.S.C. § 1962(c)**

112.    PNC incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

113.    Knezevic, RPM, North Sawyer, and P&T ("Knezevic Entities") and the non-party entities affiliated with the Knezevic Entities namely Dimic, Drazo, Denali, Bluestar, NKM, Mon-Ex and IM Truck (the "Borrowing Entities") violated RICO and PNC was injured as a result.

114.    Each of the Knezevic Entities and the Borrowing Entities is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

115.    Each of the Knezevic Entities and the Borrowing Entities violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs and as further described below.

116.    The Knezevic Entities, together with the Borrowing Entities form an association-in-fact for the common purpose of constituting an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity ("Enterprise").

117.    Knezevic, as the primary principal of the Knezevic Entities, had personal access and/or control of all of the actions of the Knezevic Entities including receipt of funds and investments of the companies' assets and as such controlled the work of the Enterprise.

118.    The Enterprise has engaged in, and its activities have affected interstate commerce, which include, but is not limited to the transferring of funds through the various checks, credit cards payments and proceeds through the banking system.

119.    The Borrowing Entities, each of whom are persons associated with the Enterprise, directly or indirectly, participated in the affairs of the Enterprise through a pattern of racketeering activity with the meaning of 18 U.S.C. 1961(2), 1961(5), and 1962(c). The Knezevic Entities and the Borrowing Entities had the specific intent to engage in the substantive RICO violation alleged in this Complaint.

120.    The acts of racketeering activity are acts which are indictable under 18 U.S.C. §1961(1)(B) and the Knezevic Entities and the Borrowing Entities committed at least two such acts or otherwise aided and abetted such acts.

15

Case: 1:20-cv-06099 Document #: 112 Filed: 04/27/22 Page 16 of 23 PageID #:1204

121. The acts of racketeering activities were not isolated and were continuous from April 2018 until 2020.

122. The Knezevic Entities and the Borrowing Entities had, upon information and belief, legitimate business plans outside of the pattern of racketeering activity and therefore the Enterprise was not limited to the predicate acts and extended beyond the racketeering activity.

123. PNC alleges that Knezevic participated in the operation and management of the Enterprise by coordinating the commission of multiple acts of racketeering.

124. The Borrowing Entities committed acts constituting indictable offenses under 18 U.S.C. §§1343 and 1344 in that they devised or intended to devise a scheme to defraud PNC to obtain money from PNC by means of false or fraudulent pretenses, representations or promises. The Borrowing Entities, in their applications with PNC, stated that the funds borrowed from PNC were to be used to purchase equipment for their respective trucking/transportation companies. However, some of the funds were instead given to the Knezevic Entities even though the Knezevic Entities were not engaged in the business of offering services to transportation/trucking companies. The acts of the Borrowing Entities were done intentionally and knowingly with the specific intent to advance the Enterprise's scheme.

125. The Borrowing Entities caused PNC to transmit thousands of dollars in funds by wire transfer.

126. The Knezevic Entities' shared objective was for the Borrowing Entities to apply for loans they had no intention of repaying using companies they had no intention of keeping to divert those funds to companies owned and operated by Knezevic whose business activities were to purchase, manage, and profit from real property real estate investments.

127.     PNC reasonably and justifiably relied upon the Borrowing Entities' false representations and PNC has been damaged as a direct and proximate cause of the Borrowing Entities' participation in the Enterprise.

128.     PNC seeks an award of three times the damages it sustained, reasonable attorneys' fees and costs.

**WHEREFORE**, PNC Bank, National Association requests that the Court award actual, compensatory, and punitive damages in its favor and against Predrag Knezevic, RPM Real Estate Investment, Inc., North Sawyer Holdings, Ltd., and P and T Real Estate Investment Group, LLC in an amount in excess of $75,000.00 to be proven at trial or hearing plus additional interest, court costs and attorneys' fees; and any and all other relief the Court deems just, proper, and equitable.

## COUNT II
### Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d)

129.     PNC incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

130.     In violation of 18 U.S.C. § 1962(d), the Knezevic Entities and the Borrowing Entities knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of the Enterprise as alleged above.

131.     Knezevic, as the primary principal of the Knezevic Entities, had personal access and/or control of all of the actions of the Knezevic Entities including receipt of funds and investments of the companies' assets and as such, controlled the work of the Enterprise.

132.     The conspiracy commenced at least as early as April, 2018.

133.     The conspiracy's purpose was to have entities apply for loans from PNC, intentionally fail to pay those loans back and divert some of the loan proceeds to entities all owned and operated by Knezevic rather than the intended purpose of the loans.

134.     Each of the Knezevic Entities and the Borrowing Entities committed at least one overt act in furtherance of the conspiracy which included misleading PNC as to the purpose of the loan applications.

135.     PNC has been injured and continues to be injured by the Knezevic Entities and the Borrowing Entities conspiracy in violation of 18 U.S.C. § 1962(d).

136.     PNC seeks an award of three times the damages it sustained, reasonable attorneys' fees and costs.

**WHEREFORE**, PNC Bank, National Association requests that the Court award actual, compensatory, and punitive damages in its favor and against Predrag Knezevic, RPM Real Estate Investment, Inc., North Sawyer Holdings, Ltd., and P and T Real Estate Investment Group, LLC in an amount in excess of $75,000.00 to be proven at trial or hearing plus additional interest, court costs and attorneys' fees; and any and all other relief the Court deems just, proper, and equitable.

### COUNT III
### Conspiracy to Defraud

137.     PNC incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

138.     The Knezevic Entities and the Borrowing Entities, and each of them, combined and agreed with other and/or others to defraud PNC by mispresenting information on the loan applications to induce PNC into loaning money to, among others, the Borrowing Entities, which was not intended to be paid back.

139.     PNC believes that, in addition to the Borrowing Entities, the Knezevic Entities may have coordinated with other PNC borrowers and either directly or indirectly benefited from other loans to PNC for which PNC did not receive payment from its borrowers.

140.   Additionally, PNC believes, that one or more of the Borrower Entities may have been directly controlled by one or more of the Defendants.

141.   PNC reasonably relied on the statements contained in the loan applications of the Borrowing Entities and its due diligence in funding the loans.

142.   Knezevic, as the primary principal of the Knezevic Entities, had personal access and/or control of all of the actions of the Knezevic Entities including receipt of funds and investments of the companies' assets and as such controlled the work of the Enterprise.

143.   The conspiracy commenced at least as early as April 2018.

144.   The Knezevic Entities and the Borrowing Entities, and each of them, acted in concert and with the common intent to support their common purpose to defraud PNC.

145.   Each committed at least one overt act in furtherance of the conspiracy including misrepresenting to PNC the purported use of the funds borrowed from PNC.

146.   The Knezevic Entities' and the Borrowing Entities' conduct was willful, wanton, and malicious.

147.   The Knezevic Entities' and the Borrowing Entities' unlawful conspiracy was a direct and proximate cause of PNC's injuries in its business.

148.   PNC seeks an award of actual damages and the imposition of punitive damages in an amount to be proven at trial or hearing.

**WHEREFORE,** PNC Bank, National Association requests that the Court award actual, compensatory, and punitive damages in its favor and against Predrag Knezevic, RPM Real Estate Investment, Inc., North Sawyer Holdings, Ltd., and P and T Real Estate Investment Group, LLC in an amount in excess of $75,000.00 to be proven at trial or hearing plus additional interest, court costs and attorneys' fees; and any and all other relief the Court deems just, proper, and equitable.

**COUNT IV**
## Fraudulent Transfer - RPM Real Estate Investment, Inc.

149.   PNC incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

150.   At the time RPM received the checks from the Borrowing Entities, PNC was a creditor of the Borrowing Entities.

151.   On information and belief, the transfers of funds from the Borrowing Entities to RPM were intentionally made.

152.   Additionally, PNC is a current creditor of I Truck Logistics.

153.   The transfers from the Borrowing Entities to RPM were made without consideration from RPM.

154.   The transfer from I Truck Logistics to RPM were made without consideration from RPM.

155.   I Truck's Logistics debt to PNC arose shortly after the transfers to RPM.

156.   The Borrowing Entities did not have assets sufficient to pay to PNC and did not pay PNC.

157.   Shortly after the transfers were made from the Borrowing Entities to RPM, the Borrowing Entities defaulted on their loans with PNC.

158.   I Truck defaulted on its loan to PNC shortly after it was made.

**WHEREFORE**, PNC Bank, National Association requests that the Court award actual, compensatory, and punitive damages in its favor and against RPM Real Estate Investment, Inc., in an amount in amount to be proven at trial or hearing plus additional interest, court costs and attorneys' fees; and any and all other relief the Court deems just, proper, and equitable.

<u>COUNT V</u>
**Fraudulent Transfer – North Sawyer Holdings, Ltd.**

159.     PNC incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

160.     At the time North Sawyer received the check from Drazo, PNC was a creditor of Drazo.

161.     At the time North Sawyer received the check from Marco Supica, PNC was a creditor of Marco Supica.

162.     At the time North Sawyer received the check from Mon-Ex, PNC was a creditor of of Mon-Ex.

163.     On information and belief, the transfer of funds were intentionally made.

164.     On information and belief, the transfers from Drazo, Mon-Ex and Marco Supica to North Sawyer were made without consideration.

165.     After the transfer was made, Drazo, Mon-Ex and Marco Supica did not have assets sufficient to pay PNC and did not pay PNC.

166.     Shortly after the transfer was made , Drazo defaulted on the Drazo Loan with PNC.

167.     Shortly after the transfer was made, NKM defaulted on the NKM Loan with PNC.

168.     Shortly after the transfer was made, Mon-Ex defaulted on the Mon-Ex Loan with PNC.

**WHEREFORE** PNC Bank, National Association requests that the Court award damages in its favor and against North Sawyer Holdings, Ltd. in an amount in amount to be proven at trial or hearing plus additional interest, court costs and attorneys' fees; and any and all other relief the Court deems just, proper, and equitable.

## COUNT VI
### Fraudulent Transfer – P and T Real Estate Investment, Inc.

169.     PNC incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

170.     At the time P&T received the check from Drazo, PNC was a creditor of Drazo.

171.     On information and belief, the reason the Drazo Check was written to P&T, was to divert funds from Drazo to P&T and to limit PNC's ability to recover from Drazo.

172.     On information and belief, the transfer of funds was intentionally made.

173.     On information and belief, the transfer from Drazo to P&T was made without consideration.

174.     After the transfer was made, Drazo did not have assets sufficient to pay PNC and did not pay PNC.

175.     Shortly after the transfer was made, Drazo defaulted on the Drazo Loan with PNC.

**WHEREFORE** PNC Bank, National Association requests that the Court award damages in its favor and against P and T Real Estate Investment, Inc. in an amount in amount to be proven at trial or hearing plus additional interest, court costs and attorneys' fees; and any and all other relief the Court deems just, proper, and equitable.

## COUNT VII
### Aiding and Abetting Fraudulent Transfer – Predrag Knezevic

176.     PNC incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

177.     At all times herein, Knezevic was the President of RPM, the President of North Sawyer, and the Manager of P&T.

Case: 1:20-cv-06099 Document #: 112 Filed: 04/27/22 Page 23 of 23 PageID #:1211

178.     Knezevic was aware of the transfers from the Borrowing Entities and I Truck Logistics to the Knezevic Entities.

179.     Knezevic, by his own admission, stated RPM did not participate in business activities with transportation companies nor did he offer a service by which those entities would pay RPM.

180.     Accordingly, the transfers from the Borrowing Entities and I Truck Logistics to the Knezevic Entities were made without consideration.

181.     The transfers from the Borrowing Entities were at least in part the reason the Borrowing Entities defaulted on their loans with PNC.

182.     Knezevic, by virtue of his positions with the Knezevic Entities and his knowledge of the transfers from the Borrowing Entities, assisted with the fraudulent transfers from the Borrowing Entities.

**WHEREFORE**, PNC Bank, National Association requests that the Court award damages in its favor and against Predrag Knezevic, in an amount to be proven at trial or hearing plus additional interest, court costs and attorneys' fees; and any and all other relief the Court deems just, proper, and equitable.

Respectfully submitted,
**PNC BANK, NATIONAL ASSOCIATION**

By: /s/   Martin J. Wasserman
       One of its Attorneys

Martin J. Wasserman ARDC # 6294040
Mona Naser ARDC # 6278114
CARLSON DASH, LLC
216 S. Jefferson Street, Suite 504
Chicago, Illinois 60661
Telephone: (312) 382-1600
Email: mwasserman@carlsondash.com
Email: mnaser@carlsondash.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PNC BANK, NATIONAL ASSOCIATION,

              Plaintiff,

    v.

PREDRAG KNEZEVIC, RPM REAL
ESTATE INVESTMENT, INC., NORTH
SAWYER HOLDINGS, LTD., and P AND T
REAL ESTATE INVESTMENT GROUP,
LLC,

              Defendants.

Case No. 20-cv-6099

## NOTICE OF FILING

TO:    Philip J. Bartolementi - Philip J. Bartolementi, Ltd.
        53 W. Jackson Blvd., Suite 1401, Chicago, IL 60604
        Email: pjblegal@hotmail.com
        *Attorney for Defendants*

**PLEASE TAKE NOTICE** that on **April 27, 2022**, the undersigned caused to be electronically filed with the Clerk of the United States District Court, for the Northern District of Illinois, **Plaintiff's Second Amended Complaint**, a copy of which is attached hereto and hereby served on you.

**PNC BANK, NATIONAL ASSOCIATION**

By: /s/ Martin J. Wasserman
              One of its Attorneys

Martin J. Wasserman, ARDC # 6294040
CARLSON DASH, LLC
216 S. Jefferson Street, Suite 504
Chicago, IL 60661
Telephone: (312) 382-1600
mwasserman@carlsondash.com

## CERTIFICATE OF SERVICE

I, Martin J. Wasserman, hereby certify that on April 27, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF electronic notification system.

/s/ Martin J. Wasserman

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PNC BANK, NATIONAL ASSOCIATION,          )
                                          )
                    Plaintiff,            )
                                          )
vs.                                       )     No. 20 cv 6099
                                          )
PREDRAG KNEZEVIC, RPM REAL ESTATE         )
INVESTMENT, INC., NORTH SAWYER            )
HOLDINGS, LTD., and P & T REAL ESTATE     )
INVESTMENT GROUP, LLC.,                    )
                    Defendants.           )

## AFFIDAVIT OF DEFENDANT PREDRAG KNEZEVIC

Your Affiant, Predrag Knezevic, on oath states the following is true and correct to the best

of my knowledge:

1. That I am the Defendant in the above captioned case. The named Defendant companies, namely, RPM REAL ESTATE, INC., NORTH SAWYER HOLDINGS, INC., and P & T REAL ESTATE INVESTMENT GROUP, LLC. are and were companies wholly owned by me:

2. That I am in the business of buying and selling real estate, mostly multi-unit buildings that I purchase in distressed condition and renovate. Thereafter I rent the units out to tenants. I may have 30 to 50 units renting at any given time, and I usually own multiple buildings as I buy and sell. I employ workers with trade experience and laborers in my business:

3. That I am well known in the Serbian Community, enjoy a reputable standing, attend social functions and events held by the Serbian Community, and have earned a trustworthy reputation:

4. That this has given me the opportunity to meet several people, some of whom I have done business with:

5. That I have made short term loans to people in the Serbian Community who may or may not own businesses, and I have assisted people with employment opportunities:

1.

6. That I do not assist people with loans, I do not co-sign loans, nor do I refer anybody to any person or bank for the purpose of making loans:

7. That I have reviewed the Second Amended Complaint that is the subject of this action:

8. I am aware that the Complaint alleges that certain companies, not named as Defendants (borrowers) in this case, were approved for loans and/or lines of credit from PNC Bank:

9. That at no time did I have any contact with any person, agent, employee or representative of PNC Bank at any time with respect to the application or approval of the loans/lines of credit that are the subject of this case:

10. That at no time did I make any representations of any kind to PNC bank to induce PNC Bank to extend loans/lines of credit to the borrowers named in the Complaint:

11. That at no time did I refer, direct or instruct any of the individuals, principals or representatives of the borrowers to PNC bank in order that they would apply for loans/lines of credit with PNC:

12. That I had no regular contact with the Borrowers, and was not aware of their particular business activities, financial activities, including solvency or their qualifications to obtain loans or lines of credit:

13. That I did not enter into any agreement, scheme or conspiracy with the borrowers named in the Complaint to secure loans and/or lines of credit with PNC Bank and was not aware if they even conducted banking business with PNC Bank:

14. That the Complaint alleges (paragraphs 40 to 47) that NKM through its principal, Marko Supica, was approved for a loan from PNC for $75,000.00 on April 13, 2018. The Complaint also alleges, and Defendant admits, receiving a check from Marko Supica in the amount of $18,750 payable to North Sawyer Holdings.

15. That the payment made by Marko Supica was the repayment of a loan I made to Supica. I did no other business with Mr. Supica, and I was not aware of the source of his funds for repayment, or Supica's financial condition. Nor was I aware that he had been approved for a loan from PNC or did business at PNC Bank prior to receiving his repayment. I was not aware that Supica defaulted on his loan or the reasons therefor:

16. That the Complaint alleges (paragraphs 51-58), that Hall Transport was approved for a loan ($50,000.00) and line of credit ($25,000.00) on July 25, 2018. The Complaint alleges, and Defendant admits receiving 2 checks from Helena Dimic, the principal of Hall Transport, in the amount of $14,000.00 on July 28, 2018 and $7,000.00 on August 6, 2018:

2.

17. That the payment to Defendant represented repayment of a loan I made to Helena Dimic for medical expenses. I was unaware of Hall or Dimic's source of funds and was unaware that Hall had been approved for a loan at PNC Bank or did banking business with PNC Bank. I was unaware that Hall and Dimic defaulted on the loan or the reasons therefor:

18. That the Complaint alleges (paragraphs 64-69) that on July 30, 2018, Hall Transport opened a credit card account with PNC Bank in the name of Helena Dimic, and that on August 9, 2018, a man named Blagoie Slijepcevic opened a credit card account at PNC Bank. I was unaware that such accounts were opened and I did not direct these individuals in any manner. Further, I do not know who Blagoie Slejepcevic is, and to my knowledge have never met him or had any financial dealings with him:

19. That the Complaint alleges that Dimic and Slijepcevic had charges place on their respective accounts by BlueStar Frieght, Inc., from August 7, 2018 to August 27, 2018. These transactions did not involve me or my companies, and I was not aware of any such transactions as it did not involve me or my companies:

20. The Complaint also alleges (paragraph 69) that from July 17, 2018 to August 23, 2018, a series of checks were received by me and my companies from BlueStar Freight, which I admit to receiving. BlueStar Freight, Inc. is owned by a family member, a Cousin, Mladen Pejanovic:

21. During the period from July 17, 2018, to August 23, 2018, I was out the country in Montenegro on an extended visit to see family. During my absence, Mladen Pejanovic was looking after my business interests in Chicago. The monies that were paid to me and my companies were loans/funds to enable Mladen Pejanovic to pay workers and other business obligations of my companies in my absence:

22. The Complaint alleges (paragraphs 70-73) that on November 9, 2018, Drazo Transport, Inc., applied for and received a loan from PNC Bank in the amount of $60,000.00. I was not involved in this transaction in any way and did not refer, direct or instruct Drazo to do so:

23. Of the $60,000.00 in loan proceeds obtained by Drazo, the Complaint alleges that three checks were paid to my companies, namely $9,000.00 to RPM on November 26, 2018, $9,200.00 to North Sawyer Holdings on November 27, 2018 and $8,000.00 to P & T Real Estate Investment Group on November 27, 2018. The payment of these funds were for a loan taken by Drazo, and I directed the manner of repayment into business accounts, which I used for the operation of my businesses. I was unaware of the source of funds used by Drazo to repay the loan or Drazo's financial condition, and did not otherwise do business with him or Drazo:

24. The Complaint alleges (paragraphs 76-78) that on June 11, 2018, Denali, Inc., applied for and received a loan in the amount of $75,000.00 and that on December 18, 2018 Denali issued a check to my company, RPM Real Estate Investment, in the amount of $10,000.00. The check was repayment of a loan to Vladan Marusic, the principal of Denali, Inc. I was not aware of his source of funds, nor did I refer, direct or instruct Marusic to PNC Bank. I had no knowledge of his financial condition and was not involved with any other business with Denali or Marusic:

25. The Complaint alleges (paragraphs 81-84) that Mon-Ex, Inc. applied for and obtained a loan in the amount of $50,000.00 a line of credit of $25,000.00 on May 14, 2019. The principal of Mon-Ex is Milodane Pusonja to whom I made a loan. The Complaint alleges and I admit receiving a check from Mon-Ex for $10,000.00 on June 20, 2019. I did not know the source of funds for the repayment of the loan. I was not a party to any loans made by PNC Bank, and I did not refer, direct or instruct Pusonja to PNC Bank. I did not know his financial condition other than he asked me to borrow him money, which I did.

26. The Complaint alleges (paragraphs 87-93) that IM Truck applied for and obtained a loan in the amount of $75,000.00 on June 27, 2018. I do not know this company or its principal, Milos Vuckovic. I did not refer, direct instruct Vuckovic to apply for a loan and have no knowledge of this man, his company or his business dealings.

27. The Complaint alleges (paragraphs 94-103) that I Truck Logistics, Inc. applied for and obtained a loan in the amount of $75,000.00 on December 2018. The Complaint alleges and I admit to receiving checks on March 24, 2018 for $8,000.00, a check for $18,200.00 on July 14, 2018 and a check for $8,000.00. I loaned him money for his purchase of equipment. I am not aware of I Truck or Vuckovic's source of funds for the repayment of the equipment loan but the PNC Bank loan was taken months after the transactions with I Truck and its principal, Marko Nikolic. I did not refer, direct or instruct Nikolic to PNC Bank to apply for a loan and I am and was unaware of his financial condition.

28. That at no time did I direct any individuals or companies to obtain loans from PNC Bank and at no time did I manage or coordinate the same. The monies I received were for loans made by me to persons for various reasons. At no time did I enter into any agreement or conspiracy to defraud PNC Bank.

4.

I, Predrag Knezevic, on oath state that I have read the foregoing, and it is true and correct to the best of my knowledge.

Predrag Knezevic, individually, and on behalf of RPM Real Estate Investment, Inc., North Sawyer Holdings, LTD., and P & T Real Estate Investment Group, LLC.

Subscribed and Sworn to this
12 day of July, 2022.

Notary Public

KRYSTAL L ROCHA
Official Seal
Notary Public - State of Illinois
My Commission Expires Apr 15, 2026

# EXHIBIT 3

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

     PNC BANK, NATIONAL                )
4    ASSOCIATION,                      )
                                       )
5                      Plaintiff,      )
                                       )
6           vs.                        ) No. 20 CV 6099
                                       )
7    PREDRAG KNEZEVIC, RPM REAL        )
     ESTATE INVESTMENT, INC.,          )
8    NORTH SAWYER HOLDINGS,            )
     LTD., and P and T REAL            )
9    ESTATE INVESTMENT GROUP,          )
     LLC,                              )
10                                     )
                       Defendants.     )
11

12           The deposition of TROY HEISHMAN, called by the

13   Defendants for examination, taken pursuant to notice and

14   pursuant to the Federal Rules of Civil Procedure for the

15   United States District Courts pertaining to the taking

16   of depositions, taken before Maria T. DiGiovanni,

17   Certified Shorthand Reporter and Registered Professional

18   Reporter, at 216 South Jefferson Street, Suite 504,

19   Chicago, Illinois, commencing at 10:56 a.m. on the

20   9th day of August, 2021.

21

22

23

24



```
 1      APPEARANCES:

 2           CARLSON DASH, LLC
             MR. C. DOUGLAS MORAN
 3           216 South Jefferson
             Suite 504
 4           Chicago, Illinois 60661
             Phone:  (312) 382-1600
 5           E-Mail:  cdmoran@carlsondash.com

 6                On behalf of the Plaintiff;

 7           PHILLIP BARTOLEMENTI, LTD.
             MR. PHILLIP J. BARTOLEMENTI
 8           53 West Jackson Boulevard
             Suite 1401
 9           Chicago, Illinois 60604
             Phone:  (312) 360-9999
10           E-Mail:  pjblegal@hotmail.com

11                On behalf of the Defendants.

12
                     *    *    *    *    *    *
13

14

15

16

17

18

19

20

21

22

23

24
```

PNC Bank vs Knezevic
Troy Heishman - 08/09/2021

Page 3

1                    I N D E X

2   WITNESS                              PAGE

3   TROY HEISHMAN

4       Direct Examination by Mr. Bartolementi.....    4

5

6

7                  E X H I B I T S

8   DEFENDANT'S EXHIBIT                   PAGE

9       No. 1 (Answers to Interrogatories).........   12

10      No. 2 (Loan Application)...................   50

11      No. 3 (Loan Application)...................   54

12

13

14

15

16

17

18

19

20

21

22

23

24



1   I pose to you, let me know.  I'm happy to rephrase it.

2       A.    Okay.

3       Q.    And we'll try to limit only one person

4   speaking at a time, which makes it difficult for the

5   reporter if multiple people are speaking, okay?

6       A.    Okay.

7       Q.    If you have any questions along the way, just

8   ask me, but we'll get going.

9       A.    Will do.

10      Q.    State your name and spell your last name for

11  the record.

12      A.    Troy Heishman, H E I S H M A N.

13      Q.    Okay.  And, Mr. Heishman, by whom are you

14  employed?

15      A.    PNC Bank.

16      Q.    How long have you been employed there?

17      A.    Little over six years.

18      Q.    Okay.  What's your current position with PNC?

19      A.    Vice president business banking.

20      Q.    Are your offices in Chicago?

21      A.    My office is in Elk Grove Village.

22      Q.    Tell me what prior positions you held before

23  this current one.

24      A.    With PNC?

```
 1    trucking companies.  It turned out to be fraudulent.
 2    And then from what I understand, is there might have
 3    been another person involved with that too.
 4         Q.   What's your basis for concluding that the
 5    loans made by the trucking companies might have been
 6    fraudulent?
 7         A.   Because they all defaulted on their loan.
 8         Q.   Is there something particular about the
 9    companies you're referring to here for your conclusion
10    that they were fraudulent as opposed to other customers
11    who may have defaulted?
12         A.   I mean, just the fact that they were -- they
13    all just never made even a first or second payment or
14    something like that.  And then I was contacted by our
15    workout group, who works on loans that go delinquent,
16    and that's how we found out.  So the fact that their
17    loan was late, and their credit card, as well, they
18    never paid on.
19              Usually they'll try to make some kind of
20    payment plan or work with the bank, but I don't believe
21    that happened in this case.
22         Q.   Is there any -- Are there any facts that
23    you're aware of that these trucking companies you
24    referred to had like a commonality about them or
```

1   something?

2       A.   No.   There's nothing that was -- I mean, they

3   referred -- they were referrals from each other.   That

4   was probably the only commonality.

5       Q.   Do you know -- For instance, when you say

6   trucking companies, I assume you're -- are you referring

7   to any particular by name?

8       A.   No.   Just -- What do you mean?

9       Q.   Well, can you name the trucking companies that

10  you say made fraudulent loans?

11      A.   I can remember -- One was called -- I want to

12  say it was Drogen (phonetic) or Drogo (phonetic) --

13  maybe -- Transport, and I remember one was Hall

14  Transport, and then the other two escape my mind.

15      Q.   Okay.   NKM Logistics?

16      A.   That was probably one of them, yes.

17      Q.   Do you know the identity of the company that

18  first came to PNC to take the loan?   You mentioned that

19  there were referrals after that.

20      A.   I don't know the name of the first company at

21  the time when this happened.

22      Q.   What's your understanding of the allegations

23  against my clients in this case?

24      A.   Well, I'm not sure who your clients even are,

1      Q.   Okay.  All right.  I'm going to direct your

2   attention to question 2, which says, Identify the full

3   name and business address of each person who

4   participated in the loan process on behalf of the

5   plaintiff -- that's PNC -- for loans which are the

6   subject of this litigation.  Namely, loans to Hall

7   Transport, Drazo Transport, and Denali, Inc.

8           Do you see that?

9      A.   Yes, I do.

10     Q.   Okay.  And the answer in number A is your

11   name, Troy Heishman, right?

12     A.   Correct.

13     Q.   It says, Originator?

14     A.   Correct.

15     Q.   Participated in the loan process on behalf of

16   Plaintiff for the loan to Hall Transport.

17     A.   Correct.

18     Q.   Okay.  Do you have any specific recollection

19   of that loan?

20     A.   Nothing other than I know we were at a -- that

21   was at the Schaumburg branch.  Other than that though, I

22   mean, it was just a standard unsecured streamline loan.

23     Q.   Okay.

24     A.   I believe this was referred to me from one of

1        A.      Not that I know of.

2        Q.      Do you know -- and I know -- I believe you

3    said you don't recall who the first trucking company is

4    that came to the bank of the ones we talked about, but

5    do you know who referred the first applicant?

6        A.      Yes.    I met with a gentleman named Daniel at

7    one of our locations in the city, and he was like a

8    broker or like a -- I'll call him a broker.    I don't

9    know if that's his official title, but maybe like

10   somebody that can help -- you know, sometimes companies

11   don't want to call a bunch of banks so we'll use a

12   broker and say, This is what I'm trying to do.

13           And the broker has the knowledge of the banks

14   and their different programs and will try to help that

15   client find the best bank to fit their need.

16           So we met with Daniel and went over what our

17   programs were, and then he introduced us to one of the

18   transportation companies.    Again, I don't know -- It

19   started with a D.    I just don't know which one it was.

20       Q.      Do you know where you would look to find the

21   identity of this broker?

22       A.      I did have a phone number and I believe I

23   shared that already.

24       Q.      Pardon?



PNC Bank vs Knezevic
Troy Heishman - 08/09/2021

Page 33

1    it on the record.

2        MR. MORAN:  No.  That's good.

3        MR. BARTOLEMENTI:  Okay.

4    BY MR. BARTOLEMENTI:

5        Q.  You would have met with Daniel in person?

6        A.  Yes.

7        Q.  Is that somebody that you knew from prior

8    deals or anything like that?

9        A.  No.  He was referred to me from another PNC

10   employee who was in our commercial group.  Commercial

11   group does higher gross revenue sales for companies.

12   So, for example, if a company does 20 million a year in

13   sales, they're part of our commercial group; whereas we

14   work with customers 5 million and under in gross annual

15   sales.  So the banker that referred him to me was

16   recently promoted to commercial group and said, Hey, we

17   want to meet with him.  I really can't work with him

18   anymore because he's got lower clients.

19       Q.  What's the name of the banker that referred

20   Daniel to you?

21       THE WITNESS:  That's good?

22       MR. MORAN:  Yeah.

23   BY THE WITNESS:

24       A.  Matt Stanio.



1   where it was.  I believe it was not in a high-risk

2   industry.

3       Q.   Does a consideration, in addition to those

4   other factors such as how long they've been in business

5   and so forth, is a factor a number of employees that

6   they have?

7       A.   No.

8       Q.   Do you require income tax returns?

9       A.   We do not for our streamline deals that are

10  under $100,000.

11      Q.   Do you just -- Does the applicant make

12  representations about what their gross income is and

13  things of that nature?

14      A.   More the gross sales of the company.

15      Q.   Gross sales?

16      A.   Correct.

17      Q.   And you just accept whatever it is they tell

18  you?

19      A.   That's correct.

20      Q.   Without any verification?

21      A.   Correct.

22      Q.   Have you ever met or had any interaction with

23  my client, Predrag Knezevic?

24      A.   I don't think so.

1      Q.    Did you ever hear his name during the process

2    of these loans with these trucking companies?

3      A.    Not that I recall.

4      Q.    I know you heard his name now because of this

5    lawsuit and everything, but other than that, you don't

6    have any recollection of ever coming across his name or

7    talking with him?

8      A.    I just don't recall that, if I spoke with him

9    or not.

10      Q.    You don't recall or have any documents showing

11    that he had any part in these loans taken by the

12    trucking companies?

13      A.    No, I don't.

14    MR. MORAN:  And just for that question, you're

15    still referring to the three that are --

16    MR. BARTOLEMENTI:  Yeah.

17    MR. MORAN:  -- identified?

18    MR. BARTOLEMENTI:  I'm referring to the three, Hall

19    Transport, Drazo, and Denali.

20    BY THE WITNESS:

21      A.    I just want to make sure Predrag is not one of

22    the -- he wasn't the owner of one of those three

23    companies?

24      Q.    No, but I'm asking you --



PNC Bank vs Knezevic
Troy Heishman - 08/09/2021

Page 38

1          A.    Then no.

2          Q.    -- if he had any -- to your knowledge, any

3     involvement in these loans?

4          A.    Not to my knowledge.

5          Q.    Okay.  Did he have involvement in any of the

6     loans with these trucking companies -- with any trucking

7     company?

8          A.    Not to my knowledge.

9          Q.    Okay.  Have you ever seen any documents -- of

10    course other than the pleadings in this case, but have

11    you seen any loan documents, PNC documents, or anything

12    with his name on it?

13         A.    No, I have not.

14         Q.    Are you aware of whether or not Mr. Knezevic

15    has any accounts with PNC?

16         A.    I am not aware of that.

17         Q.    You haven't checked on that?

18         A.    No.

19         Q.    Do you know anything about RPM Real Estate

20    Investment, Inc.?

21         A.    I do not.

22         Q.    North Sawyer Holdings, Limited?

23         A.    I do not.

24         Q.    P and T Real Estate Investment Group, LLC?



# EXHIBIT 4

PNC Bank vs Knezevic
Matthew Stanio - 09/13/2021

Page 5

```
 1    nodding yes or no, the words have to be spoken.  Okay?
 2         THE WITNESS:  Understood.
 3    WHEREUPON:
 4                      MATTHEW STANIO,
 5    called as a witness herein, having been first duly
 6    sworn, was examined and testified as follows:
 7                      EXAMINATION
 8    BY MR. BARTOLEMENTI:
 9         Q.   All right.  State your name and spell your
10    last name for the record?
11         A.   Matthew Stanio, S T A N I O.
12         Q.   And by whom are you employed?
13         A.   PNC Bank.
14         Q.   How long have you been employed by PNC Bank?
15         A.   17 years.
16         Q.   And what is your present duty and title?
17         A.   I'm a vice president of commercial banking.
18         Q.   In 2018, 2019, was that your role?
19         A.   Yes.
20         Q.   And do you know a gentleman by the name of
21    Troy Heishman?
22         A.   Yes, sir, I do.
23         Q.   How do you know him?
24         A.   He's a business banker, colleague of mine.  I
```



1   used to work out of the Carol Stream office initially,

2   that's kind of where I started my career with PNC, and

3   then once I moved into the commercial space, I utilized

4   that office from time to time and he was there.  So, you

5   know, we were just colleagues.

6        Q.   Okay.  And you know him on a personal level?

7        A.   On a personal -- mostly just colleagues at

8   work.

9        Q.   Correct.  Okay.  What did you do to prepare

10  for the deposition today, other than speak with counsel,

11  and I don't want you to tell me what you spoke about?

12       A.   Nothing, really.

13       Q.   You didn't review any documents or anything?

14       A.   No.  The only document that I have received

15  was the document for the deposition, itself, that just

16  kind of outlined I guess the people that were involved.

17       Q.   Okay.  And, to your knowledge, are you -- and

18  you're not in possession of any documents related to

19  this case?

20       A.   No, sir.

21       Q.   When we took the deposition of Troy Heishman,

22  he represented that a gentleman by the name of Daniel

23  Giljen, G I L J E N, was referred to him by you, that

24  would have been maybe back in 2018 or so; is that right?

```
 1    Do you recall that?

 2         A.    I do not recall that, no.

 3         Q.    Okay.  Do you have any reason to doubt

 4    Mr. Heishman, his testimony that he referred a gentleman

 5    named Daniel Giljen to you?

 6         A.    That he referred the gentleman to me?

 7         Q.    Yes -- Excuse me.  Sorry.  I had this

 8    reversed.  Strike that.  I apologize.

 9              That Daniel Giljen was referred to Troy

10    Heishman by you?

11         A.    No.  I would say that that would be plausible.

12         Q.    What were the years that you and Troy worked

13    in the same office, and if you still do?

14         A.    You know what?  That's kind of difficult to

15    say because I was in the office, especially with the

16    pandemic, probably 2000-, you know, '18 and a portion of

17    '19.

18         Q.    Right.  Yeah.  This is pre-pandemic.

19              Was that -- You worked in the same building?

20         A.    No.  No.  So I was actually working -- We have

21    our corporate office that we were working in Downers

22    Grove, but due to the fact in situations where I had

23    client meetings that were closer to Carol Stream,

24    instead of going to Downers Grove and then driving a
```

# EXHIBIT 5

1      IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3    PNC BANK, NATIONAL ASSOCIATION,          )
                                              )
4                    Plaintiff,               )
                                              )
5         vs.                                 ) No. 20 CV 6099
                                              )
6    PREDRAG KNEZEVIC, RPM REAL ESTATE        )
     INVESTMENT, INC., NORTH SAWYER           )
7    HOLDINGS, LTD., and P and T REAL         )
     ESTATE INVESTMENT GROUP, LLC.,           )
8                                             )
                     Defendant.               )
9

10          The deposition of JILL FELBER, called by the

11   Defendant for examination, taken remotely via LegalView

12   pursuant to notice and pursuant to the Federal Rules of

13   Civil Procedure for the United States District Courts

14   pertaining to the taking of depositions, taken before

15   Traci L. Gidley, Certified Shorthand Reporter,

16   Registered Professional Reporter, and Notary Public, in

17   Parma-Heights, Ohio, commencing at 9:00 a.m. on

18   September 13, 2021.

19

20

21

22

23

24



PNC Bank vs Knezevic
Jill Felber - 09/13/2021

Page 2

```
 1   APPEARANCES:

 2        CARLSON DASH, LLC
          MR. DOUG MORGAN - via videoconference
 3        216 South Jefferson Street
          Suite 504
 4        Chicago, Illinois 60661
          E-Mail:  Mwasserman@carlsondash.com
 5
               On behalf of the Plaintiff;
 6
          PHILLIP J. BARTOLEMENTI, LTD.
 7        MR. PHILLIP J. BARTOLEMENTI - via videoconference
          53 West Jackson Boulevard
 8        Suite 1401
          Chicago, Illinois 60604
 9        Phone:  (312) 360-9999
          E-Mail:  Pjblegal@hotmail.com
10
               On behalf of the Defendants.
11

12

13                  *    *    *    *    *    *

14

15

16

17

18

19

20

21

22

23

24
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com



1     Q.   Okay.  Tell me what your understanding is?

2     A.   My understanding was that we received a

3  fraudulent application and that the money did not get

4  used for what it was intended to be used for.

5     Q.   Okay.  When you say fraudulent application,

6  are you purposely referring to one application or a

7  number of applications?

8     A.   I'm aware that there were multiple, I don't

9  know like how many.

10     Q.   Have you ever heard of my client?  His name is

11  Predrag Knezevic, K N E Z -- excuse me -- spelled

12  K N E Z E V I C, Knezevic?

13     A.   No.

14     Q.   Have you ever heard of RPM Real Estate

15  Investment, Inc.?

16     A.   No.

17     Q.   North Sawyer Holdings, LTD?

18     A.   I mean, I can't recall.

19     Q.   Okay.  How about P and T Real Estate

20  Investment Group, LLC?

21     A.   I mean, it sounds familiar, but that just

22  might be hearsay.

23     Q.   Other than the action that was filed by the

24  attorneys retained by PNC, are you aware of any internal

PNC Bank vs Knezevic
Jill Felber - 09/13/2021

Page 11

1    Denali, Inc., or anything like that?

2         A.    No.

3         Q.    Are you aware of any other loans that you were

4    involved in other than the Denali loans?

5         A.    No.

6         Q.    Okay.  Did you actually or affirmatively check

7    to see what other loans you may have handled that you

8    alleged to be fraudulent?

9         A.    They did not release any of the customer

10   names, so I -- I'm not aware if I was or wasn't.

11        Q.    Okay.  How did you become aware that you had

12   handled a Denali loan?

13        A.    Through our counsel, reached out a few weeks

14   ago.

15        Q.    So is it fair to say that you can't say one

16   way or the other whether you handled any other loans

17   that are alleged to have been fraudulent?

18        A.    I mean, it's -- I would have to be given the

19   names to know for sure, but as of right now, I am

20   unsure.

21        Q.    Okay.  The only one you're sure about is

22   Denali, Inc.?

23        A.    Correct.

24        Q.    Now, you're an underwriter with PNC; is that



1    Q.    Is there anywhere in these -- in this exhibit,

2    in this documents that you've seen -- well, let me just

3    do this:  Back up to the top which is that handwritten

4    application, do you know how or if Mr. Marusic was

5    referred to PNC?

6        MR. MORGAN:  Are you asking for her personal

7    knowledge or based on the review of the documents?

8        MR. BARTOLEMENTI:  Both.

9        MR. MORGAN:  Okay.

10   BY THE WITNESS:

11   A.    I wouldn't be able to tell.

12   Q.    In the documents I showed you and in any of

13   the documents that you may have reviewed for the

14   deposition, are you aware of any documents that would

15   indicate that Mr. Predrag Knezevic referred or directed

16   Mr. Marusic to go to PNC to make this loan?

17   A.    No.

18   Q.    Have you -- Have you seen any documents or

19   spoken to anyone, not including the attorney, that

20   identified any statements or documents or anything to

21   show that my client, Predrag Knezevic participated in

22   the operation or management of this loan with

23   Mr. Marusic?

24   A.    No.