IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 C 6099 |
| | ) | |
| PREDRAG KNEZEVIC, RPM REAL | ) | Judge Joan H. Lefkow |
| ESTATE INVESTMENT, INC., NORTH | ) | |
| SAWYER HOLDINGS, LTD., and P AND T | ) | |
| REAL ESTATE INVESTMENT GROUP, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

PNC Bank, National Association (PNC) made small business loans to several trucking

companies that are not party to this suit (the Borrowing Companies).[1] PNC alleges that the

Borrowing Companies then gave the proceeds of these loans to Predrag Knezevic and the entities

he controlled, RPM Real Estate Investment, Inc. (RPM), North Sawyer Holding, Ltd. (North

Sawyer), and P and T Real Estate Investment Group, LLC (P&T) (collectively, Defendant

Companies), even though the Defendant Companies were not involved in the trucking business

and had no business relationship with the Borrowing Companies. PNC now brings federal claims

against Knezevic and the Defendant Companies (collectively, the defendants) for violation of the

Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 (Count I),

---

[1] PNC identifies Hall Transport, Inc. (Hall); Drazo Transport, Inc. (Drazo Transport); Denali, Inc. (Denali); BlueStar Freight Inc. (BlueStar); Mon-Ex, Inc. (Mon-Ex); NKM Logistics LLC (NKM); IM Truck LLC (IM Truck); and I Truck Logistics, Inc. (I Truck) as Borrowing Companies. (*See* dkt. 112 at 5–13.) These companies were involved in similar but not factually identical conduct. As set forth below, in some instances, PNC alleges the involvement of only some of these companies in the events supporting a given claim. This opinion uses "Borrowing Companies" to refer generally to this set of eight companies but identifies specific entities where relevant.

and conspiracy to violate RICO (Count II), as well as state law claims alleging conspiracy to defraud (Count III), fraudulent transfer (Counts IV–VI), and aiding and abetting fraudulent transfer (Count VII).[2] (Dkt. 112.) Before the court is PNC's motion for partial summary judgment on Counts IV–VI (dkt. 119) and the defendants' motion for summary judgment on all counts (dkt. 132). For the following reasons, PNC's motion is granted and the defendants' motion is denied.

## SUBJECT MATTER JURISDICTION

PNC's second amended complaint invokes the court's diversity jurisdiction under 28 U.S.C. § 1332 (*see* dkt. 112 ¶ 15), but PNC has not properly identified the citizenship of the LLC defendant. PNC alleges that P&T's "sole member is Knezevic." (*Id.* ¶ 11.) But in its Local Rule (LR) 56.1 statement in support of its motion, PNC states (and the defendants admit) that "Knezevic's girlfriend, Trenita Lane, was the other member and 50% owner of Defendant P and T." (Dkt. 120 ¶ 9.) The court sees no information about Lane's citizenship in the complaint, the briefing on the summary judgment motions, or the LR 56.1 statements. As such, it cannot conclude that complete diversity of citizenship exists and cannot assume that it has jurisdiction under § 1332. *See, e.g.*, *Thomas* v. *Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007) ("For diversity jurisdiction purposes, the citizenship of an LLC is the citizenship of each of its members.") (citation omitted). But in the absence of diversity jurisdiction, the court still has original jurisdiction over the RICO claims (Counts I and II) pursuant to § 1331 and supplemental jurisdiction over the state law claims (Counts III–VII) pursuant to § 1367 and can proceed to the merits on that basis.

---

[2] As demonstrated by their briefing on the motions for summary judgment, the parties agree that Illinois law applies.

## BACKGROUND

On summary judgment, the court relies on the factual assertions and objections thereto contained in the parties' LR 56.1 submissions, and it may enforce strict compliance with LR 56.1 procedures. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). What follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or, if an objection to an asserted fact was raised, based on the court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Thus, if a submitted fact is not included below, it is because it either was immaterial and provided no helpful context or was unsupported by the evidence.[3]

## I.     PNC's Small Business Loans

PNC offers small business loans as term loans or lines of credit under $100,000. (PSOAF ¶ 1.) These loans do not require collateral. (RDSOF ¶ 20.) When accepting a loan application, the bank's loan originator or coordinator verifies the applicant's driver's license and check with the Illinois Secretary of State website to verify that the company is in good standing, who the officers or members are, and when it was incorporated. (DSOF, Ex. 3 at 18:13–20:6. *See also* DSOF, Ex. 5 at 21:1–5; PSOAF, Ex. 5 ¶ 5.) The bank accepts the applicant's representation about the company's gross sales without verification. (DSOF, Ex. 3 at 36:11–21. *See also id.* Ex. 5 at 20:3–10.) PNC also reviews credit reports before making a loan. (PSOAF, Ex. 5 ¶ 7.) Loan applicants are not required to provide tax returns. (RDSOF ¶ 20.) Once PNC disburses the loan

---

[3] This decision cites each party's LR 56.1(a)(2) statement of facts as "DSOF ¶ _" or "PSOF ¶ _" and PNC's LR 56.1(b)(3) statement of additional facts as "PSOAF ¶ _." Responses submitted pursuant to LR 56.1(b)(2) and 56.1(c)(2) are indicated with an additional "R," as in "RDSOF." For unexplained reasons, the defendants have filed multiple submissions of their LR 56.1 statement. The statement itself first appears at dkt. 136, while dkts. 138–142 include duplicate versions of the statement with a different single exhibit attached in each instance.

proceeds to borrowers, it does not verify whether those entities use the funds for their stated purpose.[4] (DSOF, Ex. 3 at 43:9–44:13.)

PNC does not make small business loans to businesses incorporated less than two years prior to the loan application. (PSOAF, Ex. 5 ¶¶ 1, 5–7.) Theoretically, a potential borrower who has not actually been in business for two years could appear to meet the two-year requirement by reinstating or amending the officers of an older business entity.[5] (DSOF, Ex. 5 ¶ 9.)

In 2018 and 2019, PNC observed defaults on a series of similar small business loans. (PSOAF ¶ 4.) These loans all originated in the Chicago area, involved trucking companies, were completely drawn down almost immediately, and went into default for non-payment almost immediately. (*Id.*) PNC also noted that the borrowers of these loans amended their registered agent or officers with the Illinois Secretary of State and that in some cases, the borrowers had reinstated a dissolved company or changed the name of an older company. (*Id.*)

## II.    Knezevic and the Defendant Companies

At all times relevant to this suit, Predrag Knezevic was the sole owner of RPM and North Sawyer. (PSOF ¶¶ 2, 5.) RPM and North Sawyer were in real estate, property, and construction businesses. They did not own any trucks or trailers. (*Id.* ¶¶ 3–4, 6–7.) Knezevic was also a member and 50% owner of P&T, along with his girlfriend, Trenita Lane, who was the other member and 50% owner. (*Id.* ¶ 8–9.) P&T never owned property, did construction work, or

---

[4] There is some debate between the parties about the extent to which PNC verified the loans to the Borrowing Companies. While the facts contained in the foregoing paragraph are supported by the undisputed evidence, the court interprets them as statements of PNC's general policies and procedures. The undisputed evidence does not establish precisely which verification procedures PNC followed in the particular case of each Borrowing Company.

[5] The court interprets this statement, taken from the affidavit of a PNC Vice President, as a statement of a hypothetical scenario and not as an assertion of what actually happened in *this* particular case.

otherwise did any business; it was formed in 2018 and dissolved in November 2019. (*Id.* ¶¶ 10–11.) Knezevic does not hold any real estate or construction licenses. (*Id.* ¶ 12.) Knezevic and the Defendant Companies are not in the trucking business. (PSOAF ¶ 32; RPSOAF ¶ 32.) Knezevic and the Defendant Companies buy, sell, and renovate real estate and rent units to tenants. (DSOF ¶ 5.) At all relevant times, Knezevic did not refer anyone to PNC for a loan or credit line, nor did he make any representations to PNC to induce PNC to provide any loans or credit lines. (*Id.* ¶¶ 9–10.)

Knezevic owns the properties at 6508 N. Richmond, Units 2A and 3A, and 3001 S. Michigan Avenue, Unit 207, both in Chicago, Illinois. (RPSOAF ¶ 20.) Several entities that have borrowed from PNC listed 6508 N. Richmond, a "multi-unit condominium building," as their address with the Illinois Secretary of State, including Borrowing Companies Hall, Mon-Ex, and BlueStar. (PSOAF ¶ 21; RPSOAF ¶ 21.) Knezevic rents 6508 N. Richmond, Unit 2A to his cousin, Milodane Pusojna, who operates Mon-Ex, and Mon-Ex listed this as its address with the Secretary of State. (PSOAF ¶ 21; RPSOAF ¶ 21.) Knezevic also rents 3001 S. Michigan Avenue, Unit 207 to a different cousin, Mladen Pjanovic, who operates BlueStar; BlueStar listed this address with the Secretary of State. (PSOAF ¶ 21; RPSOAF ¶ 21.) Hall's address is listed with the Secretary of State as 6508 N. Richmond, Unit 1A, but Knezevic does not own that particular unit. (RPSOAF ¶¶ 19, 20.)

### III. The Borrowing Companies' Loans and Subsequent Payments to the Defendants

At some point before PNC issued the trucking company loans at issue in this case, Troy Heishman, PNC's Vice President for business banking, met with a loan broker named Daniel Giljen. (DSOF ¶ 11; PSOAF ¶¶ 22–23.) Several of the loans at issue in this case were "referred from each other such that one loan led to another loan." (PSOAF ¶ 24.) Giljen referred the first

company (likely either Denali or Drazo Transport[6]) to PNC; the subsequent borrowers "were referrals from each other." (DSOF ¶ 13.) Heishman handled the loans to Denali, Hall, Drazo Transport, and NKM. (*Id.* ¶ 11.)

Knezevic once did remodeling work on a building owned by Giljen. (PSOAF ¶ 25; DSOF ¶ 41; RDSOF ¶ 43.) At some point, Knezevic was also a manager of an entity that co-owned a property with Giljen and that had provided a mortgage to a different entity owned by Giljen. (PSOAF ¶¶ 26–29.) Heishman has never met Knezevic; he also has not received any information that would indicate that Knezevic was involved with the loans to the Borrowing Companies. (DSOF ¶ 17.) Jill Felber, a PNC underwriter who was involved in at least one of the loans to the Borrowing Companies, testified that she had never heard of Knezevic or RPM and could not recall whether she had ever heard of North Sawyer. (DSOF ¶ 18; RDSOF ¶ 19.)

Knezevic had no direct contact with PNC. (DSOF ¶ 45.) He states that he was not aware of the funding source for the payments he received from Hall, Drazo Transport, Mon-Ex, and I Truck.[7] (*Id.* ¶¶ 24, 30, 32, 38.) The details of PNC's loans to the trucking companies are next set forth in further detail.

### A.     NKM Logistics, LLC

On April 13, 2018, NKM applied for and received a term loan of $75,000 from PNC. (PSOF ¶ 25.) NKM applied for the loan through its principal, Marko Supica, who also guaranteed the loan. (*Id.* ¶¶ 25–26.) The stated purpose of the loan was for purchasing

---

[6] The parties agree that Giljen "could not recall the name of the company other than it started with a 'D.'" (DSOF ¶ 13.)

[7] These statements are supported by citations to Knezevic's affidavit. PNC disputes these facts but, in so doing, does not "cite specific evidentiary material that controverts the fact." LR 56.1(e)(3). Instead, PNC states that "this was all part of the conspiracy to defraud the Bank" and cites generally to its entire LR 56.1 Statement of Additional Material Facts. (RDSOF ¶ 24, 30, 32.) The court thus deems these facts admitted, pursuant to LR 56.1(e)(3).

equipment. (*Id.* ¶ 27.) Immediately after NKM obtained the loan, it withdrew the funds and transferred them to Supica. (*Id.* ¶ 29.) NKM defaulted on the loan. (*Id.* ¶ 30.) Kathleen Huhta, a Vice President at PNC (*Id.* Ex. 2 ¶ 1), reviewed the proceeds distributed from the loan and concluded that none were used to purchase equipment (PSOF ¶ 15).

On April 27, 2018, Supica obtained a cashier's check for $18,750 from PNC, payable to North Sawyer; North Sawyer later deposited the check. (*Id.* ¶ 31.) The payment "related to" money that Knezevic borrowed from Supica (for which no documentation exists). (*Id.* ¶ 32.) Knezevic never did business with NKM and was not familiar with it. (*Id.* ¶ 33.)

On June 21, 2019, after filing suit, PNC obtained a judgment of $84,216.01 against NKM and Supica. (*Id.* ¶¶ 35–36.) NKM has not made payments toward the judgment. (*Id.* ¶ 37.) Supica left the United States sometime in 2018 or 2019 and now resides in Serbia. (*Id.* ¶ 34.)

### B. Denali, Inc.

On June 11, 2018, Denali applied for and received a term loan of up to $75,000 from PNC, which PNC funded via wire transfer. (PSOF ¶ 46.) The stated purpose of the loan was to purchase a semi-truck. (*Id.* ¶ 47.) Huhta reviewed the proceeds distributed from the loan and concluded that they were not used to purchase a semi-truck. (*Id.* Ex. 2 ¶ 28.)

Sometime before December 2018, Knezevic remodeled the kitchen in the private residence of Denali's principal, Vladan Marusic; no contract or documentation of this work exists. (PSOF ¶ 49.) Knezevic and the Defendant Companies never did any work for Denali itself. (*Id.* ¶ 50.) On December 18, Denali issued a $10,000 check to RPM, as negotiated by RPM, as payment for the Knezevic's remodel of Marusic's kitchen. (*Id.* ¶¶ 51–52.) Denali defaulted on the loan to PNC and currently owes PNC $84,253.20.

### C.     I Truck Logistics, Inc.

Sometime before July 14, 2018, Knezevic made a loan to Marko Nikolic, the principal of I Truck, for which no documentation exists. (PSOF ¶ 66.) I Truck wrote three checks to the Defendant Companies: on March 24, 2018, an $8,000 check to RPM; on July 14, 2018, an $18,200 check to RPM; and on September 24, 2018, an $8,000 check to an unspecified defendant. (PSOF ¶ 64; DSOF ¶ 39.) These payments served as repayment of the loan from Knezevic to Nikolic. (PSOF ¶ 67.) The defendants never did business with I Truck or purchased anything from I Truck. (PSOF ¶ 68.)

On or about December 20, 2018, I Truck applied for and received a $75,000 loan from PNC through Nikolic. (DSOF ¶ 36.) The stated purpose of the loan was for working capital. (PSOF ¶ 63.) I Truck later defaulted on the loan from PNC and currently owes PNC $37,430.61. (*Id.* ¶ 65.) As of August 2021, Nikolic was in jail, having been charged with fraudulent misappropriation of funds from the U.S. Small Business Administration's Economic Injury Disaster Loan program. (PSOF ¶ 69; RPSOF ¶ 69.)

### D.     Hall Transport, Inc.

On July 25, 2018, Hall applied for and received a term loan of up to $50,000 and a credit line of $25,000 from PNC. (PSOF ¶¶ 13–14.) Less than two months before receiving this loan and credit line, the company, which was originally incorporated as Hallilovic Maintenance, changed its name to "Hall Transport, Inc." with the Illinois Secretary of State. (PSOAF ¶ 18.) Hall applied for the loan and credit line through its principal, Jelena Dimic, and the stated purpose of the loan was for purchasing equipment. (PSOF ¶¶ 13–15.) After PNC funded the loan and credit line via wire transfer (*Id.* ¶¶ 13–14), Hall drew down its line of credit, liquidated the account containing the credit funds, and defaulted on the loan (*Id.* ¶¶ 16–17).

8

Hall sent checks to RPM on July 28 and August 6 for $14,000 and $7,000, respectively. (*Id.* ¶ 18.) The defendants "negotiated" these checks, which were personal exchanges between Dimic and Knezevic.[8] (*Id.* ¶¶ 18, 20.) RPM and Knezevic had never done business with Hall. (*Id.* ¶ 19.) Knezevic did not have any subsequent contact with Dimic. (*Id.* ¶ 21.) According to Knezevic, he did not know where Dimic had gotten the funds and did not know about Dimic's account at PNC. (DSOF ¶ 24.)

On March 20, 2019, PNC filed suit against Hall and Dimic for breaching the loan agreements. (PSOF ¶ 22.) PNC subsequently obtained a judgment of $81,843.56 against Hall on May 28, 2019. (*Id.* ¶ 23.) Hall did not make any payments toward the judgment. (*Id.* ¶ 24.) Pursuant to the judgment, RPM was served with a Third-Party Citation to Discover Assets on July 11, 2019. (PSOAF ¶ 31.)

### E. Drazo Transport, Inc.

On November 9, 2018, Drazo Transport applied for and received a term loan of up to $60,000 from PNC, which PNC funded by wire transfer. (PSOF ¶ 38.) The stated purpose of the loan was for purchasing equipment. (*Id.* ¶ 39.) Huhta reviewed the proceeds distributed from the loan and concluded they were not used to purchase equipment. (*Id.* Ex. 2 ¶ 22.)

On November 26 and 27, Drazo Transport issued from its PNC account a $9,000 check to RPM, a $9,200 check to North Sawyer, and a $8,000 check to P&T. (PSOF ¶ 43.) As of that time, Knezevic did not conduct business with Drazo Transport, but he had met the principal of Drazo Transport a few times and conducted personal business with him. (*Id.* ¶ 41.) The payments from Drazo Transport to RPM, North Sawyer, and P&T were repayment of a loan made to Drazo

---

[8] There is a dispute about the purpose of the exchange between Knezevic and Dimic, as Knezevic's deposition testimony and affidavit appear to conflict on this point. (*See* DSOF ¶ 24; RDSOF ¶ 24.) All parties agree that the payment was related to a personal matter.

Transport's principal.[9] (*Id.* ¶ 45.) Drazo Transport defaulted on the PNC loan and currently owes PNC $78,607.97. (*Id.* ¶ 44.)

### F.    Mon-Ex, Inc.

On May 14, 2019, Mon-Ex, Inc. (Mon-Ex) applied for and received a term loan of up to $50,000 and a credit line of $25,000 from PNC. (PSOF ¶ 54.) The stated purposes of the loan and credit line were for purchasing equipment and working capital. (*Id.* ¶ 55.) Huhta reviewed the proceeds distributed from the loan and concluded they were not used to purchase equipment. (*Id.* Ex. 2 ¶ 32).

Mon-Ex's principal, Milodane Pusonja, is a friend of Knezevic.[10] (PSOF ¶ 57.) Sometime prior to June 20, 2019, Knezevic made a personal loan to Pusonja, but Knezevic never loaned money to Mon-Ex or otherwise did business with Mon-Ex. (*Id.* ¶¶ 57–58.) On June 20, Mon-Ex issued a $10,000 check to North Sawyer. (*Id.* ¶ 59.) Mon-Ex defaulted on its loan and credit line, and it currently owes PNC $31,094.78. (*Id.* ¶ 60.)

---

[9] Defendants admitted that Knezevic's brother loaned money to Drazo Transport's principal in Belgrade, Serbia, and that the principal was to repay this personal loan (for which no documentation exists) to Knezevic. (PSOF ¶ 41–42; PSOAF, Ex. 1 at 131:22–132:12.) In the defendants' 56.1(a)(2) statement, they state that the payments from Drazo Transport to the Defendant Companies were "repayment of a loan made to Drazo." (DSOF ¶ 30; *id.* Ex. 2 ¶ 23.) PNC disputes this statement, citing Knezevic's deposition testimony about the loan to Drazo Transport's principal from Knezevic's brother. (RDSOF ¶ 30.) Further review of the deposition testimony reveals that Knezevic seemed to refer to Drazo Transport's principal as "Drazo" as well, apparently causing confusion. When asked about Drazo Transport, Knezevic stated, "I'm not familiar, but I know who's that." (PSOAF, Ex. 1 at 130:10–13.) When asked when he met this person, Knezevic did not know, but he had met him in a Serbian restaurant somewhere. (*Id.* at 131:5–14.) When asked, "Do you remember his name?" Knezevic responded, "Everybody call 'Drazo.' I don't know. That's it. I don't know first and last name." (*Id.* at 131:7–9.) He also confirmed that he did not do business with Drazo Transport but did business with Drazo "personally." (*Id.* at 131:15–21.) The court thus concludes that Drazo Transport repaid a loan made to Drazo (the principal) individually, and Knezevic's affidavit is consistent with that fact.

[10] As noted earlier, the defendants also admitted to a different factual statement that identified Pusonja as Knezevic's cousin.

### G.    BlueStar Freight, Inc.

PNC issued a credit card to BlueStar Freight, Inc. (BlueStar) sometime in 2018, but BlueStar did not make any payments on it. (PSOAF, Ex. 8 ¶ 11.) Between July 17 and September 28, 2018, the defendants received fifteen checks from BlueStar and/or Mladen Pjanovic, who operates the company.[11] (*Id.* ¶ 6(c).) Between August 7 and August 11, 2018, Hall made five payments to BlueStar. (*Id.* ¶ 7; *id.* Ex. 8 ¶ 10.)

### H.    IM Truck, LLC

IM Truck, LLC (IM Truck) received a $75,000 loan from PNC on June 27, 2018. (DSOF ¶ 33.) It subsequently defaulted on the loan. (PSOAF ¶ 15.)

Brad Tokarz is a business partner of Knezevic. (*Id.* ¶ 11.) Sometime around August 2020, Knezevic approached Tokarz about purchasing IM Truck so they could "be a beneficiary" of government programs that were "giving out money for companies … that were established." (PSOAF, Ex. 9 at 21:1–14, 22:19–20.) Knezevic told Tokarz they could "own the company and then [they could] start a business." (*Id.* at 21:16–20.) Tokarz had initially agreed to the proposition but then decided it "didn't feel right" and that "something [was] weird," so he told Knezevic he had changed his mind and did not want to be involved. (*Id.* at 21:10–22:9; PSOAF ¶ 14.) At some point, someone other than Tokarz listed him as the manager of IM Truck with the Illinois Secretary of State's Office without Tokarz's authority or approval.[12] (PSOAF ¶ 13.)

---

[11] There is a dispute about the purpose of these payments, as Knezevic's deposition testimony and affidavit appear to conflict on this point. (*See* DSOF ¶ 28; RDSOF ¶ 28.)

[12] It is not clear whether this happened before or after the conversation in which Tokarz told Knezevic he did not want to be involved.

## **LEGAL STANDARD**

Summary judgment is appropriate where there is no genuine dispute of material fact, entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant has the initial responsibility of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). If the movant carries its burden, the nonmovant must then show a genuine dispute of fact supported by "proper documentary evidence." *Weaver* v. *Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). The nonmovant must do more than raise "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); rather, he "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. The court views all facts in the light most favorable to the nonmovant and draws all reasonable inferences in his favor. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. When the court is presented with cross-motions for summary judgment, it "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Kort* v. *Diversified Collection Services, Inc.*, 394 F.3d 530, 536 (7th Cir. 2005) (citation omitted).

## ANALYSIS

### I.   Federal Civil RICO, 18 U.S.C. § 1962(c) (Count I)

Defendants move for summary judgment on Count I of PNC's complaint, in which PNC

claims that defendants violated 18 U.S.C. § 1962(c), a provision of RICO.[13] "[T]o establish a

violation of § 1962(c) … a plaintiff must show the following four elements by a preponderance

of the evidence: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity.'" *Jennings* v. *Auto Meter Prod., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007) (quoting

*Sedima, S.P.R.L.* v. *Imrex Co.*, 473 U.S. 479, 496 (1985)). The "pattern" must comprise "at least

two acts of racketeering activity" (predicate acts) within a ten-year period. 18 U.S.C. § 1961(5).

Here, the alleged "enterprise" comprises Knezevic, the Defendant Companies, and

certain borrowers (particularly Drazo Transport, Denali, NKM, Mon-Ex, and Hall).[14] The crux of

PNC's claim is that the enterprise's "shared objective was for the Borrowing Entities to apply for

loans they had no intention of repaying … [and] to divert those funds to companies owned and

operated by Knezevic." (Dkt. 112 ¶ 126.)

Defendants' main argument in support of their summary judgment motion is that PNC

has pointed to insufficient evidence in support of its claim. It is worth taking a moment to

---

[13] PNC brings Counts I, II, and III against all defendants (Knezevic, RPM, North Sawyer, and P&T), seemingly on the theory that Knezevic acted through the companies he owned. (*See, e.g.*, dkt. 144 at 7 ("The Bank has set forth significant evidence related to the participation of Knezevic and the Defendant Companies (through Knezevic as the sole owner or individual in control) [in the RICO scheme].").) This is a reasonable inference in PNC's favor where Knezevic apparently owned or controlled the Defendant Companies, and the defendants have not put forth any argument that they should each be treated differently for the purpose of deciding their summary judgment motion. As set forth in the analysis that follows in text, the court concludes that there is at least a genuine issue of material fact that precludes summary judgment in favor of the defendants on each of these claims. PNC may do well to clearly articulate the liability of *each* defendant on *each* claim at future stages of the litigation— particularly in the case of P&T, which, unlike the other Defendant Companies, was only 50% owned by Knezevic.

[14] PNC does not clearly delineate which Borrowing Companies were involved in the enterprise, but it focuses on the conduct of these five companies in its motion.

recapitulate the undisputed facts, viewed in the light most favorable to PNC, and the reasonable inferences drawn therefrom. Knezevic was a business associate of Daniel Giljen, a loan broker who first made contact with PNC and referred the first of the trucking companies to PNC for a loan. At least five of the borrower trucking companies (NKM, Denali, Hall, Drazo Transport, and Mon-Ex) followed a similar and suspicious pattern. Each obtained a loan and/or credit line from PNC within the span of roughly one year. NKM, Denali, Hall, and Mon-Ex each obtained $75,000. All five of the companies sent somewhere between 13.3% and 43.7% of their funds to the defendants, sometimes within only a few weeks of obtaining the loans. The borrowers sent these funds to the Defendant Companies, rather than Knezevic himself, even though the Defendant Companies were not in the trucking industry and the funds were supposedly for repayment of personal debts. These companies all defaulted on their loans. BlueStar, another trucking company, received five payments from Hall in August 2018 and obtained a credit card from PNC at some point that year. BlueStar and/or its principal sent fifteen checks to the defendants between July and September 2018. The principals of BlueStar and Mon-Ex are both cousins of Knezevic and live in properties that he rents to them, which they also use as the addresses for their respective businesses. In 2020, Knezevic approached another business associate, Brad Tokarz, about purchasing IM Truck, another company that had received a $75,000 loan from PNC in 2018, on which it defaulted. Knezevic told Tokarz that they could purchase the company and then "start a business" so they could take advantage of a government program that was giving loans to established companies. Tokarz declined to participate. At some point, he discovered that someone had purchased the company in his name without his approval.

### A.  Racketeering Activity

Racketeering activity includes, as argued here (*see* dkt. 144 at 7), an act "indictable" as financial institution fraud under 18 U.S.C. § 1344. *See* 18 U.S.C. § 1961(1)(B). Section 1344 penalizes an individual who "knowingly executes, or attempts to execute, a scheme or artifice to defraud a financial institution" or to obtain funds controlled by a financial institution by means of fraudulent pretenses. Specific intent is therefore a "necessary element of the crime of bank fraud" and "may be established by circumstantial evidence." *United States* v. *Howard*, 30 F.3d 871, 874 (7th Cir. 1994) (citation omitted). "Because direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself …." *United States* v. *LeDonne*, 21 F.3d 1418, 1427 (7th Cir. 1994).

PNC has provided sufficient evidence from which a reasonable jury could conclude that the defendants participated in a "scheme to defraud" PNC—specifically, that Knezevic was involved with the borrowers' plans to obtain loans from PNC for purposes other than what was represented to the bank and then receive a portion of the loan proceeds himself. A reasonable jury could also conclude that the defendants engaged in more than two such acts of racketeering activity—specifically, each time a Borrowing Company took out a loan from PNC and then sent a portion to Knezevic. The defendants never argue that these events did not satisfy the racketeering activity requirement. PNC has shown enough to survive summary judgment as to this element.

### B.  Enterprise

A RICO "enterprise" may be "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal

entity." 18 U.S.C. § 1961(4). An association-in-fact, as alleged here, "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle* v. *United States*, 556 U.S. 938, 946 (2009). But it "need not have a hierarchical structure or a 'chain of command.'"[15] *Id.* at 948.

The conduct in this case goes beyond an ordinary "commercial relationship" and is not "consistent with [the Borrowing Companies] and [the defendants] each going about its own business." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund* v. *Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) (holding that companies had not formed a RICO enterprise in part because their conduct was characteristic of a normal commercial relationship and did not go beyond the level of cooperation inherent in normal commercial transactions). Knezevic and the Defendant Companies had no business relationships with the Borrowing Companies; indeed, they were not even involved in the same industry. *See also Bible* v. *United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) ("Our cases have distinguished between … a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest.") Additionally, the enterprise need not have a purpose aside from the purpose of joining together to commit the fraudulent acts. *See, e.g.*, *United States* v. *Volpendesto*, 746 F.3d 273, 296 (7th Cir. 2014) ("A person who agrees to commit multiple robberies with an association-in-fact certainly shares in the enterprise's common purpose—to enrich himself and the enterprise through illegal means.").

---

[15] PNC's assertion that the purported enterprise was "amenable to the hierarchical and consensual decision-making of Knezevic" (dkt. 144 at 9) seemingly refers to pre-*Boyle* caselaw and is irrelevant for the present analysis.

In sum, the connections between the defendants and the borrowers and the repeated pattern of conduct that could not be explained by a normal commercial relationship permit the reasonable inference that these entities formed an enterprise.

### C.   Conduct

To satisfy the "conduct" element of its RICO claim, PNC must show that the defendants "participated in the operation or management of the enterprise itself, and … played some part in directing the enterprise's affairs." *Sabrina Roppo* v. *Travelers Com. Ins. Co.*, 869 F.3d 568, 589 (7th Cir. 2017) (cleaned up).

The defendants argue that PNC fails to provide evidence that the defendants participated in the operation or management of the enterprise and that they have established, on the contrary, that Knezevic did not participate with the borrowers in applying for loans or connect any borrowers to the bank. (Dkt. 159 at 9.) Additionally, the borrowers were "independently approved" for their loans and did not need any assistance from Knezevic in order to access the loan funds.[16] (Dkt. 134 at 8.) Moreover, "the bulk of the loan proceeds, not paid to Knezevic, are not accounted for by [PNC], as they were not paid to Knezevic or his companies."[17] (Dkt. 134 at 8.) Knezevic states that he was not aware that the funds he received from Hall, Drazo Transport, and Mon-Ex came from PNC loans. (*See* DSOF ¶ 24, 30, 32.)

---

[16] Although the court agrees that the statements here are supported by the undisputed facts, these and other factual statements in the defendants' briefs lack proper citations to the LR 56.1 statements. *See* LR 56.1(g).

[17] The court's back-of-the envelope calculations, based on the undisputed evidence, show that the borrowers sent the following amounts to the defendants: NKM sent 25% of its loan ($18,750 out of $75,000); Denali sent approximately 13.3% of its loan ($10,000 out of $75,000); Hall sent 28% of its combined loan and credit line ($21,000 out of $75,000); Drazo Transport sent approximately 43.7% of its loan ($26,200 out of $60,000); and Mon-Ex sent approximately 13.3% of its combined loan and credit line ($10,000 out of $75,000).

PNC argues in response that Knezevic and the Defendant Companies (through Knezevic) "directed" the affairs of the purported enterprise. (Dkt. 144 at 7.) In support, PNC points out that Knezevic is the "common denominator" among the borrowers, which is supported by the undisputed facts. In addition, PNC contends that Knezevic's attempt to persuade Tokarz to buy IM Truck with him and then apply for loans exemplifies the "overall scheme of the Defendants" and that this "same type of scenario" was repeated with Hall. (Dkt. 144 at 7–8.) Further, PNC states that "at least seven trucking companies involved in the RICO enterprise" list their business addresses at properties that Knezevic owns or leases. (Dkt. 144 at 8.)

As for the probative value of the IM Truck facts, there is a key difference between that episode and the events involving Hall: IM Truck obtained a loan from PNC in 2018, but Knezevic did not ask Tokarz about purchasing the company until 2020. By contrast, Hall changed its company name two months *before* applying for the PNC loan. As for the seven companies with addresses at Knezevic properties, this list includes five companies that PNC has neither alleged were part of the enterprise nor provided any facts about. (PSOAF ¶ 21.) The remaining two companies, Mon-Ex and BlueStar, were operated by Knezevic's cousins, to whom Knezevic leased apartments.

Still, the court concludes that a reasonable jury could find that Knezevic played some part in directing the enterprise. The undisputed facts show that each of the several borrowers took out a loan from the same bank, purportedly for business purposes, within a short window of time. They then paid a portion of that loan to one of Knezevic's companies. The fact that Knezevic did not directly apply for loans with the bank or refer the borrowers to the bank does not do much to establish that he was not involved, behind the scenes, in directing the scheme. And as PNC points out, Knezevic was the "common denominator" in the conduct at issue. He had

relationships with the principals of several of the borrowing entities, and in all cases, the borrowing entities sent him a substantial portion of their PNC loan funds.

Although the defendants argue that Knezevic is "an outsider here" (dkt. 134 at 8), the Supreme Court has said that "'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and … participate in the operation or management of the enterprise itself," "not just their *own* affairs." *Reves* v. *Ernst & Young*, 507 U.S. 170, 185 (1993). The court cannot say that no reasonable jury could conclude Knezevic was so involved based on the undisputed facts, and so it cannot grant summary judgment for defendants on this issue.

### D.  Pattern (Continuity Plus Relationship)

Next, PNC must show "a relationship between the predicate acts as well as a threat of continuing activity." *Menzies* v. *Seyfarth Shaw LLP*, 943 F.3d 328, 337 (7th Cir. 2019) (citation omitted). Here, PNC argues that each instance in which a borrower fraudulently obtained a loan from PNC and then paid some of the funds to the defendants constitutes a separate but related predicate act of racketeering activity. (*See* dkt. 144 at 7, 9.) The court accepts that the predicate acts are related because they were "close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission." *Menzies*, 943 F.3d at 337.

The focus then turns to continuity. "[A] RICO plaintiff can satisfy the continuity prong either by (1) demonstrating a close-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Roger Whitmore's Auto. Servs., Inc.* v. *Lake Cnty., Illinois*, 424 F.3d 659, 673 (7th Cir. 2005). PNC argues that it can establish both closed-ended and open-ended continuity.

19

A closed-ended series of conduct exists where "there were enough predicate acts over a finite time to support a conclusion that the criminal behavior would continue," taking into account "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Menzies*, 943 F.3d at 337. Assessing continuity is a fact-specific inquiry employing a multifactor test of which no one factor is dispositive. *Roger Whitmore's Auto Servs.*, 424 F.3d at 673. That said, "duration is the single most important aspect of the closed-ended continuity analysis," *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 781 (7th Cir. 1994). Here, there is a genuine dispute of fact about the precise duration of the enterprise's conduct (*see* dkt. 144 at 9–10; dkt. 134 at 8–9), but all parties agree that the conduct spanned at least eight months (*see* dkt. 134 at 8). The court cannot conclude, as a matter of law, that this is an insufficient length of time. *See Roger Whitmore's Auto Servs.*, 424 F.3d at 673 ("Although we have not employed a bright-line rule for how long a closed period must be to satisfy continuity, we have not hesitated to find that closed periods of several months to several years did not qualify as 'substantial' enough to satisfy continuity."). Moreover, the court cannot conclude, based on the undisputed facts, that the additional factors—the quantity of predicate acts, schemes, victims, and distinct injuries—would conclusively show the absence of continuity. In sum, PNC has demonstrated a genuine issue of fact as to whether the racketeering activity had closed-ended continuity. Because PNC can satisfy the continuity requirement by showing either closed-ended or open-ended continuity, the court need not decide whether there is also a genuine dispute of fact as to open-ended continuity.

### E.      Injury

A RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496. *See* 18 U.S.C. § 1964(c). The plaintiff must show that the "pattern of racketeering activity" was both the but-for and proximate cause of its injury. *RWB Servs., LLC* v. *Hartford Computer Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008) (citing *Holmes* v. *Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)). "If a predicate act was sufficient to cause the plaintiff's injury and that predicate act was part of the entire 'violation of section 1962,' the plaintiff has pled [but-for] causation." *RWB Servs.*, 539 F.3d at 687. And as for proximate causation, "the central question … is whether the alleged violation led directly to the plaintiff's injuries," *Anza* v. *Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006), meaning that the "victim was reasonably foreseeable," *RWB Servs.*, 539 F.3d at 688.

The defendants argue that PNC's "claim of injury derives from the borrowers' loan default" and that PNC has not shown that the defendants' conduct was a but-for or proximate cause of that injury. (Dkt. 134 at 11.) This argument misses the mark. Although PNC does not clearly identify the supposed injury in the section of its response discussing the RICO claim (*see* dkt. 144 at 10–11), it states in the introduction to its response that the defendants "encouraged and controlled certain Borrower Companies to defraud the Bank and planned and/or assisted those Borrower Companies in the scheme to defraud the Bank out of over $500,000.00." (Dkt. 144 at 1.) The court can reasonably infer that this number refers to the $573,574 that PNC argues the defendants received from twenty-six different trucking companies. (PSOAF ¶ 6.) The defendants dispute this total insofar as it includes payments not explicitly listed, but they admit the payments listed from NKM, Hall, BlueStar, Drazo Transport, I Truck, Denali, and Mon-Ex.

21

(RPSOAF ¶ 6.) Regardless of the total amount, it is undisputed that the defendants received a substantial portion of the loan proceeds these various borrowers obtained from PNC. PNC's alleged injury, then, is the money obtained by the borrowers through their fraudulent misrepresentations and subsequently paid to the defendants at the defendants' direction.

As discussed above, PNC has established genuine issues of fact on the elements of the RICO claim itself, which sets forth a scheme in which the defendants directed an enterprise to obtain loans from PNC based upon fraudulent misrepresentations and then funnel a portion of the proceeds to the defendants. Under that theory, the predicate acts of the enterprise caused PNC's injury, and PNC would have been a reasonably foreseeable victim of the scheme. In sum, there is at least a triable issue as to whether the defendants' alleged racketeering conduct caused PNC's injury.

PNC has provided sufficient evidence on the elements of its RICO claim and its standing to recover such that "a reasonable jury could return a verdict" for it. *Anderson*, 477 U.S. at 248. The defendants' motion for summary judgment on Count I is denied.

## II.    Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d) (Count II)

Defendants move for summary judgment on Count II of PNC's complaint, which alleges that defendants conspired to violate RICO in violation of 18 U.S.C. § 1962(d). To establish a conspiracy under § 1962(d), PNC must show that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Slaney* v. *The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001). Agreement to participate requires that the defendants "[were] aware of the essential nature and scope of the enterprise and intended to participate in

it." *United States* v. *Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988) (citation omitted). Finding a triable issue as to the substantive RICO claim is not dispositive of the conspiracy claim, as "not all substantive RICO violations constitute conspiracies." *DeGuelle* v. *Camilli*, 664 F.3d 192, 204 (7th Cir. 2011). The defendants argue that they are entitled to summary judgment simply because PNC has not pointed to sufficient evidence to support its claim. (*See* dkt. 134 at 11–12.)

The court is not persuaded by PNC's argument that Knezevic's communication with Tokarz about purchasing IM Truck "describe[s]" the "conspiracy itself" (dkt. 144 at 12) because the Tokarz episode differs from events supporting the RICO claim. IM Truck received a loan from PNC in June 2018. Knezevic did not approach Tokarz about purchasing IM Truck until faround August 2020. This does not provide evidence of the alleged underlying RICO offense— a purported scheme in which the borrowers obtained loans from PNC and then cut checks to the defendants—and thus does not help establish a conspiracy to commit that underlying violation.

Still, PNC can establish Knezevic's actual knowledge "either by direct or circumstantial evidence," and circumstantial evidence "involves drawing an inference from the circumstances." *Domanus* v. *Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017). To have knowledge of the conspiracy, the defendants "[did] not need to know the intricacies and full dimensions of the scheme," but they must have been "aware of its essential scope and nature." *Id.* PNC has provided enough evidence for the court to draw such an inference here. The undisputed evidence establishes a suspicious pattern of payments from each of the borrower companies to Knezevic and the defendant companies as well as relationships between Knezevic and the principals of several of these companies. Acknowledging that Knezevic denies having knowledge of where the borrowers' payments to him originated and taking no position on whether PNC has provided enough evidence to prevail on this claim at trial, the court concludes that it has at least

established a genuine issue of material fact concerning the defendants' knowledge of the "scope and nature" of the scheme. The defendants' motion for summary judgment as to Count II is denied.

### III.   Conspiracy to Defraud (Count III)

Defendants move for summary judgment on Count III of PNC's complaint, which alleges that defendants conspired with the Borrowing Companies to defraud PNC. To establish a conspiracy to defraud, PNC must show "(1) a conspiracy; (2) an overt act of fraud in furtherance of the conspiracy; and (3) damages to the plaintiff as a result of the fraud." *Bosak* v. *McDonough*, 549 N.E.2d 643, 646 (Ill. App. Ct. 1989). "A 'conspiracy' is a combination of two or more persons to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means." *Id.* The conspiracy may be established by "clear and convincing" "circumstantial evidence and legitimate inferences therefrom." *Id.* As discussed earlier, PNC has established a genuine issue of fact as to the existence of a coordinated scheme among the defendants and the Borrowing Companies to defraud the bank by misrepresenting the actual purpose of the loans on their applications and subsequently using the loans for purposes other than the ones permitted by the bank, including giving a portion of the proceeds to Knezevic for fulfillment of personal debts. And as discussed earlier, PNC has shown a genuine issue as to the resulting injury it suffered.

What remains is the overt act of fraud requirement. In support of their motion, the defendants argue that they could not have been part of such a conspiracy because they never had direct contact with PNC and did not help the borrowers get the loans. (*See* dkt. 134 at 12–13.) A civil conspiracy claim requires "an agreement and a tortious act committed in furtherance of that agreement," but the defendants do not need to commit the tortious act themselves because "the

civil conspiracy theory has the effect of extending liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act." *McClure* v. *Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). *See also Bosak*, 549 N.E.2d at 646 ("If a conspiracy is shown, an injured plaintiff need only establish that an overt fraudulent act in furtherance of the conspiracy was committed *by one of the alleged conspirators*.") (emphasis added). PNC does not squarely identify an overt act, but the court can reasonably infer, based on their description of the scheme, that the borrowers' misrepresentations to PNC and subsequent misuse of the loan funds would suffice.[18] The defendants' motion for summary judgment as to this count is denied.

## IV. Fraudulent Transfer as to RPM (Count IV), North Sawyer (Count V), and P&T (Count VI)

PNC and the defendants filed cross-motions for summary judgment on Counts IV–VI of the complaint, which allege that multiple Borrowing Companies made fraudulent transfers to RPM (Count IV), North Sawyer (Count V), and P&T (Count VI) in violation of the Illinois Uniform Fraudulent Transfer Act (IUFTA), 740 Ill. Comp. Stat. 160/1, *et seq.* The defendants argue in their own motion that they are entitled to summary judgment on these counts (*see* dkt. 134 at 13–14), but they argue in their response to PNC's motion that there are genuine issues of material fact as to multiple elements of the claims (*see* dkt. 147 at 7) and explicitly state that "defendant is not entitled to summary judgment" (*see id.* at 10). The court interprets this as a concession by the defendants that they are not entitled to summary judgment and instead will

---

[18] Neither party outlines the elements of the underlying common-law fraud, but they are "(1) a false statement of material fact; (2) the defendant knew the statement was false; (3) the defendant intended that the statement induce the plaintiff to act; (4) the plaintiff relied upon the truth of the statement; and (5) the plaintiff suffered damages from his reliance on the statement." *Time Savers, Inc.* v. *LaSalle Bank, N.A.*, 863 N.E.2d 1156, 1167 (2007). In failing to address the co-conspirators' arguable acts of fraud, the defendants have certainly not satisfied their initial responsibility of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

evaluate only PNC's motion as to these three counts. The court thus "construe[s] all inferences in favor of [the defendants as] the party against whom the motion under consideration is made." *Kort*, 394 F.3d at 536.

### A. Transfers to Defendant Companies by NKM, Denali, Hall, Drazo Transport, and Mon-Ex

PNC argues that certain transfers from certain Borrowing Companies to the Defendant Companies were fraudulent under 740 Ill. Comp. Stat. 160/6 on a "fraud in law" theory.

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 Ill. Comp. Stat. 160/6(a). To establish its fraud in law fraudulent transfer claim, PNC must show the following: "(1) there must be a transfer made for no or inadequate consideration; (2) there must be existing or contemplated indebtedness against the transferor; and (3) it must appear that the transferor did not retain sufficient property to pay his indebtedness." *Gendron* v. *Chicago & N. W. Transp. Co.*, 564 N.E.2d 1207, 1215 (1990).

In support of its claim, PNC argues that the following transfers from NKM, Hall, Drazo Transport, Mon-Ex, and Denali to RPM, North Sawyer, and P&T were fraudulent:

> (1) an April 27, 2018 payment from Marko Supica (NKM['s principal]) to North Sawyer in the amount of $18,000.00;[19] (2) a December 18, 2018 payment from Denali to RPM in the amount of $10,000.00; (3) a July 28, 2018 payment in the amount of $14,000.00 from Hall to RPM; (4) an August 6, 2018 payment in the amount of $7,000.00 from Hall to RPM; (5) a November 26, 2018 payment in the amount of $9,000.00 from Drazo to RPM; (6) a November 27, 2018 payment in the amount of $9,200.00 from Drazo to North Sawyer; (7) a November 27, 2018 payment in the amount of $8,000.00 from Drazo to P and T; and (8) a June 20, 2019 payment in the amount of $10,000.00 from Mon-Ex to North Sawyer.

---

[19] This is seemingly an error in the motion, as the LR 56.1 Statement states that this check was for $18,750.00. (PSOF ¶ 31.)

(Dkt. 121 at 9.)

First, there is no fraudulent transfer claim as to the payment from Supica (the principal of NKM) to North Sawyer because Supica, as an individual, was not indebted to PNC. PNC's undisputed facts show that NKM obtained a loan from PNC, then withdrew those funds and transferred them to Supica. Supica later "obtained a cashier's check from PNC" that he sent to North Sawyer. (PSOF ¶ 31.) But PNC has cited no authority and provided no argument that this could suffice to establish a fraudulent transfer claim based on the transfer between Supica and North Sawyer.[20]

As for the remaining transfers, in each case, the borrowing entity had obtained a loan from PNC prior to making the transfer to one of the Defendant Companies (*see* dkt. 121 at 10), thus satisfying the "existing indebtedness" element of the claim.

To demonstrate inadequate consideration, PNC must show that "the debtors"—here, Denali, Hall, Drazo Transport, and Mon-Ex —"made the transfer … without receiving reasonably equivalent value in exchange for the transfer." 740 Ill. Comp. Stat. 160/6(a). To assess reasonable equivalence, courts consider factors including "(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee." *Wachovia Sec., LLC* v. *Neuhauser*, 528 F. Supp. 2d 834, 860 (N.D. Ill. 2007) (citing *Barber* v. *Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997)).

There is not much need to consider these factors here, as the undisputed facts show that the borrowers did not receive consideration from the Defendant Companies *at all*. The Defendant Companies argue that that they did, in fact, furnish consideration (*see* dkt. 147 at 7–8), but as

---

[20] PNC notes that Supica guaranteed the NKM loan (*see* dkt. 10), but if they mean to say that this makes Supica *individually* indebted to PNC in the meaning of the statute, they must make that argument.

PNC correctly points out, "The Defendant Companies were not creditors of the Borrowing Entities," so the transfers "did not satisfy any pre-existing obligation between the Borrowing Entity and the Defendant Company" (dkt. 158 at 9). Rather, Knezevic (as an individual) forgave various personal debts owed to him by the principals of the Borrowing Companies (as individuals) in exchange for the transfers. The undisputed evidence shows that neither Hall, Drazo Transport, Mon-Ex, nor Denali received anything of value from RPM, North Sawyer, or P&T in exchange for the transfers. *See Thompson* v. *Illinois State Bd. of Elections*, 945 N.E.2d 625, 630 (2011) ("It is a well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors and officers."); *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 163 (2001) ("[I]ncorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs."); *Peabody-Waterside Dev., LLC* v. *Islands of Waterside, LLC*, 995 N.E.2d 1021, 1024 (Ill. App. Ct. 2013) ("A limited liability company (LLC) is a legal entity distinct from its members.").

Turning to the third and final element of the fraudulent transfer claim, PNC must establish that the borrower-transferors did not retain sufficient assets to pay their debts. This can be less than actual insolvency; "[t]he test is whether the [allegedly fraudulent] conveyance directly tended to or did impair the rights of creditors." *Falcon* v. *Thomas*, 629 N.E.2d 789, 796 (1994). "It is of no moment that the property remaining in the grantor's hands after the conveyance was in nominal value more than equal to the amount of his indebtedness if subsequent events show that the property retained was not sufficient to discharge all his liabilities." *Cairo Lumber Co.* v. *Ladenberger*, 39 N.E.2d 596, 598 (Ill. App. Ct. 1941). Here, the relevant "subsequent events" include: (1) PNC's obtaining a judgment against Hall, which

remains unpaid; and (2) defaults by Denali, Drazo Transport, and Mon-Ex, each of which owes PNC tens of thousands of dollars. PNC argues that the judgments and defaults are evidence of insolvency. *See* 740 Ill. Comp. Stat. 160/3(b) ("A debtor who is generally not paying his debts as they become due is presumed to be insolvent.").

The defendants respond that in the case of each transfer, the borrowers transferred to the defendants some amount less than the full amount of their PNC loans, implying that each borrower retained the remaining funds. (*See* dkt. 147 at 9.) But this does nothing to establish that the borrower retained sufficient funds to repay the *full* value of its indebtedness to PNC, having given a portion of the loan funds away to the defendants. Beyond that, the defendants' only argument is that the record lacks evidence that they did *not* retain sufficient property to pay their indebtedness. (*See id.*) This is insufficient to avoid summary judgment when PNC has set forth undisputed facts establishing a presumption of insolvency under Illinois law. PNC is therefore entitled to summary judgment on Counts IV, V, and VII as to the transfers from Denali, Hall, Drazo Transport, and Mon-Ex to the Defendant Companies.

### B. Transfer to RPM by I Truck

PNC also argues that I Truck's transfers to RPM (and possibly another Defendant Company) were fraudulent under 740 Ill. Comp. Stat. 160/5. In contrast to Section 160/6 discussed above, Section 160/5 concerns transfers made *before* the creditor's claim arose—here, the claim involves allegations that I Truck gave money to RPM in March and July 2018 before taking out a loan from PNC in December 2018.

PNC does not attempt to argue actual fraudulent intent, so the court understands it to be arguing that the I Truck transfer violated 160/5(a)(2) on a fraud in law theory. Such a claim requires that "(1) the debtor made a voluntary transfer; (2) at the time of the transfer, the debtor incurred obligations elsewhere; (3) the debtor made the transfer without receiving a reasonably

equivalent value in exchange; and (4) after the transfer the debtor failed to retain sufficient property to pay his indebtedness." *Grochocinski* v. *Schlossberg*, 402 B.R. 825, 838 (N.D. Ill. 2009) (citing *GE Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir.1997)). But PNC fails to establish the second element of its claim. I Truck took out its loan from PNC after making the challenged transfers, and there is no other evidence in the record of its financial situation in March or July 2018 when it transferred funds to RPM. *Compare In re Phillips*, 379 B.R. 765, 783 (Bankr. N.D. Ill. 2007) (finding a violation of 740 Ill. Comp. Stat. 160/5(a)(2) where the evidence showed that, at the time of the challenged transfer, the transferor had a judgment pending against him and had significant debt). As no evidence in the record establishes I Truck's obligations at the time of the transfer, PNC is not entitled to summary judgment concerning the allegedly fraudulent transfer from I Truck to RPM.

## V.      Aiding and Abetting Fraudulent Transfer as to Knezevic (Count VII)

Finally, the defendants move for summary judgment on PNC's claim against Knezevic individually for aiding and abetting the Defendant Companies' fraudulent transfers. "Under Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Hefferman* v. *Bass*, 467 F.3d 596, 601 (7th Cir. 2006).

As the court grants PNC's motion for summary judgment on its fraudulent transfer claims as to at least some of the transfers, the court can easily conclude that there is a triable issue as to whether Knezevic was aware of or assisted those transfers. The defendants are correct that the undisputed evidence does not conclusively establish that Knezevic "substantially assisted the violation," but there is at least some evidence suggesting that he may have, creating an issue for the jury. As discussed at length above, the undisputed evidence shows that Knezevic was closely

connected to the alleged scheme—the various borrowers took out loans from the same bank, close in time, for similar amounts, and then all gave a portion of those loans to one of Knezevic's companies, even though these companies were not in the same industry and had never done business with the companies from which they received money. Furthermore, Knezevic contends that the payments were in satisfaction of debts that these loan borrowers' principals had incurred with him, personally. A reasonable jury might conclude that the only way the transfer payments to Knezevic's companies could have satisfied personal debts owed to Knezevic is if Knezevic played a role in directing the transfer payments to his companies. There is at least enough evidence to establish a triable issue as to Knezevic's role in the violation.

## CONCLUSION AND ORDER

The defendants' motion for summary judgment (dkt. 132) is denied. PNC's motion for partial summary judgment (dkt. 119) on Counts IV, V, and VII is granted, insofar as those Counts concern fraudulent transfers made by Denali, Hall, Drazo Transport, and Mon-Ex.

Date: March 31, 2023

_____
U.S. District Judge Joan H. Lefkow